John H. Altorfer and Harriett P. Altorfer v. Commissioner.
Altorfer v. Commissioner
Docket No. 72944.
United States Tax Court
T.C. Memo 1961-48; 1961 Tax Ct. Memo LEXIS 300; 20 T.C.M. (CCH) 266; T.C.M. (RIA) 61048; February 24, 1961
*300 Jackson L. Boughner, Esq., 120 S. La Salle St., Chicago, Ill., and Timothy W. Swain, Esq., for the petitioners. Don S. Harnack, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: A deficiency in income tax for 1955 of $60,623.47 is in controversy. The question is whether an interest in a contract of sale distributed to petitioner as a result of a corporate liquidation had an ascertainable fair market value at that time. This is the only controversy, the parties having agreed that respondent's method of computing the value was correct if the contested issue is decided in his favor. Findings of Fact Some of the facts have been stipulated. They are hereby found according. Petitioners' return for the calendar year 1955 was filed with the district director of internal revenue at Springfield, Illinois. Perma Starch, Inc., was incorporated under the laws of the State of Illinois on December 15, 1948. It was the successor to a business previously operated by a partnership consisting of Perry V. Eakin and Cyril J. Geisler. Commencing on December 15, 1948 and continuing until December 30, 1954, Perma Starch, Inc., had outstanding *301 2,100 shares of common stock. Petitioner John H. Altorfer (hereinafter referred to as petitioner) owned 630 shares, Cyril J. Geisler owned 630 shares and Perry V. Eakin owned 840 shares. During that period, there were also outstanding 2,500 shares of preferred stock, of which 750 shares were owned by petitioner, 750 shares were owned by Geisler and 1,000 shares were owned by Eakin. Perma Starch, Inc., was engaged solely in the manufacture of starch. Its gross sales and net profits before income taxes for its entire existence, as shown on its original income tax returns, were as follows: Gross Profit
Net Income
Fiscal Year Ended
Gross Sales
from Sales
Before Tax
June 30, 1949
$432,433.89
$216,535.49
$36,099.70
June 30, 1950
937,094.14
336,939.92
13,620.22
June 30, 1951
532,189.36
374,193.10
13,272.01
June 30, 1952
670,824.51
445,306.51
7,054.58
June 30, 1953
742,751.51
466,345.59
5,318.13
June 30, 1954
755,715.81
486,190.41
1,793.25
Dec. 31, 1954 (6 mos.)
386,688.40
259,852.93
17,462.82
On December 18, 1954, the directors and shareholders of Perma Starch, Inc., adopted a plan of liquidation. On December 21, 1954, Perma Starch, *302 Inc., entered into a memorandum of agreement with Milner Products Company (now known as Dumas Milner Corporation). The agreement was to sell to Milner Products Company all the corporate assets of Perma Starch, Inc., special provision being made for accounts receivable, cash and certain cash items, for a total consideration described as follows: 3. Purchaser agrees to buy the assets listed in Paragraph 1 hereof from the seller on the closing date and to pay therefor a price of $1,600,000.00, payable in the following manner and subject to the following reductions: a. The sum of $100,000.00 shall be paid coincidentally with the execution of this Memorandum of Agreement, receipt thereof being acknowledged by seller, which amount shall be applied in payment of the purchase price on the closing date or shall be retained by seller as liquidated damages in the event purchaser shall fail to consummate this agreement through no fault of the seller. b. The sum of $184,889.24 adjusted to reflect sales made out of inventory by Perma Starch, Inc., between the date hereof and the closing date shall be paid on closing date by the delivery to seller of 4 promissory notes or trade acceptances *303 hearing interest at 4% and payable in 30, 60, 90, and 120 days, respectively, executed by the purchaser and bearing the personal endorsement of Milner. c. On or before January 10, 1956, and on or before the 10th day of January in each succeeding year until payment of the full amount of the purchase price, purchaser shall pay to the seller, or its assigns, an amount equal to 10% of the annual gross sales made by purchaser of the product now marketed under the name Perma Starch during the preceding calendar year, provided that the payments to be made in the years 1956 and 1957 shall not be less than the sum of $100,000.00 each. d. If the aggregate of the payments made by purchaser to seller shall equal $1,500,000.00 on or before January 10, 1962, the total price to be paid by purchaser shall be $1,500,000.00 and shall be deemed to be fully paid. If said payments shall not then total the sum of $1,500,000.00, the total price shall be $1,600,000.00 as above stated. e. Until the purchase price is paid in full, if in any calendar year the total sales of Perma Starch by purchaser shall be less than $800,000.00, the seller or its assigns shall have an option to re-acquire the land, buildings, *304 manufacturing machinery, and other assets, other than inventories, without payment therefor and all installments on purchase price paid by purchaser to the date of the excercise [exercise] of this option by seller shall be liquidated damages and shall not be subject to repayment to purchaser, provided that seller may not exercise this option, regardless of the amount of purchaser's sales of any calendar year, if the sum of $100,000.00 is paid by seller to purchaser on or before the 10th day of January of the next succeeding year. The final payment of the purchase price due hereunder is due and payable in all events on or before January 10, 1969. f. If the seller is unable to provide merchantable titles to the real estate and other assets to be conveyed, or otherwise shall fail to consummate this agreement through no fault of the purchaser, the $100,000.00 referred to in Paragraph 3-a above shall be refunded to the purchaser. On December 30, 1954, Perma Starch, Inc., changed its name to E.G.A. Corporation. On [1] January 3, 1955, E.G.A. Corporation and Milner entered into a contract of sale and escrow agreement, the former purporting to supplement the memorandum agreement. *305 The contract of sale recited the receipt of the initial installment of the purchase price totalling $400,000 by the following payments: Retained assets, such as cash
and accounts receivable
$122,307.87
Earnest money payment
100,000.00
Four promissory notes
177,692.13 It reads in part as follows: Coincidentally herewith, Purchaser has executed an Escrow Agreement naming The First National Bank of Memphis, Tennessee, as Escrow Agent, and has deposited, or will deposit, in said escrow Deeds and other instruments re-conveying the purchased assets, other than inventories, to the Seller. A true and correct copy of said Escrow Agreement is attached hereto as Exhibit A and is incorporated herein by reference. The purpose of said Escrow Agreement and of said deposited instruments is to provide a method whereby the obligations of the Purchaser, under this paragraph, shall be self-executing in the event the Purchaser shall default hereunder. Purchaser agrees to continue the operation of the plant, acquired from Seller, at Illiopolis, Illinois, until either it shall cease its manufacture of starch or synthetic starch products or until the purchase price, payable hereunder, *306 shall be paid in full and it agrees that it will not transfer its manufacture of "Perma Starch" (or other starch or synthetic starch products) to another location nor will it sell said premises during such time as Seller or its assigns shall have rights under said Escrow Agreement (Exhibit A hereto). Seller or its assigns was permitted to examine sales records of purchaser. In the escrow agreement, which was executed as of the same date, Milner deposited with the First National Bank of Memphis, Tennessee, a warranty deed to the property it was obtaining from Perma Starch in Illinois, a bill of sale to the machinery and equipment it was obtaining, an assignment of the trademark "Perma Starch," and a bill of sale to the good will and other intangibles pertaining to the business of manufacturing starch or synthetic starch products. On [2] June 24, 1955, E.G.A. Corporation assigned to petitioner and its other stockholders all right, interest and title of E.G.A. Corporation arising under: (a) The Memorandum Agreement dated December 21, 1954. (b) The Contract of Sale dated January 3, 1955. (c) The Escrow Agreement dated January 3, 1955. *307 The assignment stated in part: This Assignment shall be deemed to include the right to receive all amounts due and to become due under each of said contracts, the right to receive the titles and assets deposited under said Escrow Agreement in the event of default by MILNER PRODUCTS COMPANY as set forth in said Escrow Agreement and in said Contract of Sale of January 3, 1955, the right to sue upon said contracts individually or collectively, or in the name of the undersigned corporation, or in the name of any nominee or assignee or any or all of said assignees, and in general to exercise, as individuals either singly or collectively, each and every right and privilege which the undersigned could exercise under said contracts in its own behalf except for this assignment, and if in existence at the time. On July 8, 1955, E.G.A. Corporation was formally dissolved. The sales of Perma Starch by Milner for the years 1955 to 1959, inclusive, were as follows: 1955
$1,057,313.54
1956
1,079,607.40
1957
1,708,138.39
1958
1,608,674.26
1959
1,441,401.58
The payments made by Milner to the former shareholders of E.G.A. Corporation from January 1956 through January *308 1960 for the years 1955 through 1959 were as follows: 1955
1956
1957
(Paid Jan.
(Paid Jan.
(Paid Jan.
1956)
1957)
1958)
John H. Altorfer
$ 31,719.40
$ 32,388.22
$ 51,244.15
Perry V. Eakin
42,292.54
43,184.30
68,325.54
Cyril Geisler
31,719.40
32,388.22
51,244.15
$105,731.34
$107,960.74
$170,813.84
1958
1959
(Paid Jan.
(Paid Jan.
1959)
1960)
Total
John H. Altorfer
$ 48,260.23
$ 43,242.05
$206,854.05
Perry V. Eakin
64,346.97
57,656.06
275,805.41
Cyril Geisler
48,260.23
43,242.05
206,854.05
$160,867.43
$144,140.16
$689,513.51
On their return for 1955, petitioners reported a sales price of $74,154.89 for an undisclosed number of Perma Starch shares. Petitioners further reported a cost on said item of $45,000, and a taxable long-term capital gain of $29,154.89. At the time the contractual obligation was assigned to petitioner, the maximum balance due thereon from the purchaser was $1,200,000. Petitioner's share of this was 30 percent or $360,000. The real estate held in escrow pursuant to and subject to the terms of the contract of sale, escrow agreement and memorandum agreement consisted *309 of 43 acres of land improved with two large main factory buildings, six smaller buildings, and serviced by a railroad spur. The seller attached U.S. Documentary stamps to cover consideration for the sale of the land in the amount of at least $200,000. As of December 31, 1954, the balance sheet of Milner showed common stock of $138,840, a loss of prior years of $40,924.86, and a profit during the current year of $62,853.71, making a total net worth as of that date of $160,768.85. Milner Products Company on that date had total assets of $658,432.17 and total liabilities of $497,663.32. Included among its current assets was the earnest money deposit on the Perma Starch contract of $100,000. Also included in current assets was an overdraft at the Deposit Guaranty Bank of $802.49, cash in the First National Bank of $4,791.72 and petty cash of $75, the above three items comprising all of the cash of this corporation on that date, as shown by the balance sheet. Perma Starch was a synthetic starch containing no vegetable starches. It consisted of polymers of plastic materials in a very fine water suspension that would penetrate into the fabric of cloth, and bind the fabric together. It *310 also contained an ironing aid that would make the product iron better. The idea for this product was originally that of a Professor Jones of the Hizone Research Laboratories. Perry Eakin and Cyril Geisler learned of the product and started, as a partnership, to develop it. From 1941 to 1948, Eakin and Geisler conducted research and experimental work in an attempt to obtain a marketable product. They first attempted to make it as a dry powder. Thereafter, they tried using a rubber product that had been used as a textile mill sizing material. In 1948, they finally went into production with plastic ploymers, having spent $152,000 in research and development. The principal production problems were the smell of the product, making it in a small enough size to penetrate the fabric, making it so it would iron properly, and keeping it from becoming toxic. A story about the product in Life Magazine in 1950 produced an unusually high level of sales. It was difficult to induce a grocer to put the product on the shelves because it sold so slowly and at such a small profit. Several of the large chain store organizations tried the product out on a test basis and refused to continue it. Some *311 of the large chain stores carried it for a while and then discontinued it. The product proved to be a seasonal one, being in demand primarily in cold climates during the summer months. The rights assigned to petitioner by E.G.A. on June 24, 1955 had no ascertainable fair market value on that date. Opinion If the sole question were whether the Milner contract had any value at all in 1955, solution of our problem would be simple. There is no doubt in our mind that a buyer could be found who would pay something for the purchaser's obligation - at least a figure close to the value of the escrowed property. So that when respondent says in his brief, "[an] examination of this obligation, made up as it is of four documents, reveals, without doubt, that it did have a very substantial fair market value on June 24, 1955," we could readily agree if the words "fair" and "market" were excluded. But fair market value requires a willing seller as well as a buyer, and the question here is whether anyone would pay what would be considered a fair price to the seller. We think not. It may not at first glance appear to have simplified the problem that the parties have agreed what the fair market *312 value was if that figure is ascertainable. Respondent arrived at it by taking the maximum [3] that could possibly be collected under the contract and discounting it at 4 1/2 percent per year because it was payable not immediately and all at once but over a period of years. He has thus assumed that for the maximum balance of $1,200,000 that the seller could collect if sales in every year reached the specified figure, [4] a buyer would pay one hundred cents on the dollar in advance provided only he were reimbursed for the intervening loss of interest on his investment. This is so extreme an assumption, and goes so deeply to the heart of the real controversy, that it is not easy to perceive why petitioners were willing to concede it. Certainly if the question were presented in the opposite way, that is if the parties had agreed that there was an ascertainable fair market value but left the price to be litigated, we should be hard put to it to say that anything like this amount could possibly have been the present worth of the contract in 1955. See . *313 In a sense, however, it does reinforce the conclusion we have reached that no figure for fair market value is really ascertainable. Respondent is saying in effect that the seller could reasonably want a price based on the maximum receivable under the contract. But it seems clear to us, on the one hand, that no purchaser could be found who would assess all the uncertainties of the contract in anything like so favorable, a light. Laying to one side the usual insecurities of contract performance, including continued solvency of the vendee, there was never a time after the first 2 years when the buyer here was compelled to pay more than 10 percent of sales. [5] These had to be higher in each year than they had ever been in any year, save one, of the history of the old company in order for the agreement to be automatically kept alive after that time. Of course, if the seller were forced to sell, he might well agree to take whatever a buyer would offer. [6] But this would not comport with the definition of fair market value. *314 Nor is there here any more than in , for example, any compelling reason why such a figure must be found. Cf. . "The liability for income tax ultimately can be fairly determined without resort to mere estimates, assumptions and speculation." . In seeking to avoid the numerous authorities applying the Logan rule, respondent says: "If * * * the only provision * * * had been * * * for payment of the purchase price at the rate of 10 per cent of annual * * * sales, it would be difficult, if not impossible, to distinguish * * * several of the cases cited." It is because "secured as it was by the going concern" that this situation is said to be different. But the security only tended to assure performance of the contract. It did not make certain the amount of sales, nor the size of the payments based thereon, where the contract itself left the whole obligation open for future developments. The parties appear to agree that the present issue is purely one of fact. For the reasons stated, we have found as the ultimate fact that the *315 property in question had no ascertainable fair market value on the critical date. Decision will be entered for the petitioners. Footnotes
1. Erroneously stipulated as January 30.↩
2. Erroneously stipulated as May 18.↩
3. It is not clear whether or not he made the assumption of early payment and accordingly deducted $100,000 from the total. ↩
4. Of course, the buyer could, if he elected, keep the contract alive by a lump payment even if the sales fell short.↩
5. Respondent is incorrect when he makes the misleading statement that.. "In the event purchaser's sales of Perma Starch totaled less than $800,000 in any year, purchaser was required to pay a minimum of $100,000." ↩
6. No such necessity existed here, as respondent recognizes: "Petitioners well realized that the obligation had very substantial value - so great, in fact, that petitioners did not consider disposing of the obligation."↩