SIMMONDS PRECISION PRODUCTS, INC., PETITIONER v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3130–76.    Filed October 14, 1980.

*Sidney I. Roberts, Laurence Goldfein,* and *Lary Wolf,* for the petitioner.

*Larry Kars,* for the respondent.

HALL, *Judge:* Respondent determined deficiencies in petitioner's income tax as follows:

| Year | Deficiency |
| --- | --- |
| 1967 | $157,101.66 |
| 1968 | 1,146,581.30 |
| 1969 | 238,562.22 |

Petitioner exchanged its stock and options for patents and other rights owned by Sir Oliver Simmonds and/or his wholly owned corporations. The primary issue is whether the options had an ascertainable fair market value. If not, and the transaction remained open until the options were exercised, we must determine the proper years for amortizing and expensing the patents and other rights acquired with the options. If the options had an ascertainable fair market value, we must determine what it was on May 20, 1960.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioner is a New York corporation which had its principal office in Tarrytown, N.Y., when it filed the petition in this case.

Petitioner was incorporated in 1936 under the name of Simmonds Aerocessories, Inc. During the period 1960 through the present, petitioner was engaged primarily in the design and manufacture of electronic, hydromechanical, and mechanical systems, instruments, controls, and devices for use in connection with missiles, military and commercial aircraft, and engines used in aircraft, small boats, and vehicles. Its principal product line was fuel-gauging systems, primarily for aircraft.

Sir Oliver E. Simmonds (Sir Oliver) founded petitioner and was a shareholder. Sir Oliver was a nonresident alien of the United States and during the 1960's resided in Nassau, Bahamas. In the 1920's and 1930's, Sir Oliver was a pioneer in the aircraft industry in Britain.

During the 1930's, Sir Oliver established his instrument and equipment companies. He formed an English holding company,

Materia, Ltd. (Materia), of which he and his wife owned all of the stock. He established Simmonds Development Co., Ltd. (Simmonds Development), another English company to hold his patents and licensing agreements. He also established a series of manufacturing companies in various countries, each called Simmonds Aerocessories. The manufacturing company in the United States was the predecessor in interest to petitioner.

Sir Oliver moved from England to the Bahamas in the late 1940's. In 1953, Simmonds Development was liquidated and Engineering Research Co., Ltd. (Engineering Research), a Bahamian company controlled by Sir Oliver, succeeded to the assets of Simmonds Development.[1] Sir Oliver formed another Bahamian corporation, Twenty First Century Corp., Ltd. (Twenty First Century), which he controlled.

Prior to May 20, 1960, petitioner sold products embodying inventions in the fields of fuel gauging systems and self-locking nuts. The rights to these inventions were licensed to petitioner from Engineering Research under a series of agreements entered into between 1939 and 1957. The basic terms of each of the license agreements with Engineering Research with respect to which petitioner produced fuel gauging systems, provided for a royalty of 5 percent of net sales (of products sold pursuant to the agreement), free of all taxes, and minimum annual royalties to be paid by petitioner to Engineering Research. Royalty payments by petitioner to Engineering Research were subject to withholding tax at a rate of 30 percent under section 871.

These license agreements were incorporated into a single agreement between Engineering Research and petitioner dated October 1, 1956. This agreement increased the minimum annual royalty to $52,500, net of the 30-percent tax on royalties, or a gross royalty of $75,000. The 1956 agreement was automatically renewable until January 15, 1969, provided certain sales levels were met. The sales levels necessary for renewal were met.

Among the patents licensed under the 1956 agreement were U.S. Patent No. 2,582,399 issued January 15, 1952, and Reissue Patent No. 24,082 dated November 1, 1955. These patents were for adjustable in-tank capacitators and contoured in-tank measuring capacitators, which were essential components of the fuel

---

[1] When we hereafter refer to Engineering Research, we shall be referring not only to it but also to its predecessor, Simmonds Development.

gauge systems manufactured by petitioner in the 1950's and 1960's and were embodied in all such systems.

Petitioner entered into a sales commission agreement with Twenty First Century on January 31, 1957. Under this agreement, Sir Oliver carried on selling activities and served as a goodwill ambassador for petitioner's products outside of the United States and Canada.[2] Sir Oliver was never employed by petitioner; his sales calls were made on behalf of Twenty First Century. Pursuant to the commission agreement, Twenty First Century was entitled to 10-percent commission on sales of petitioner's products in its territory.[3] Unless renewed, this agreement would have expired January 31, 1962; such a renewal was probable.

Due, in part, to his personal contacts with the leaders of the British and European aerospace industries, Sir Oliver (through Twenty First Century) obtained sales of petitioner's fuel gauging systems for the Viscount, Vanguard, and BAC–111 planes manufactured by Vickers in Britain and the Caravel manufactured by Sud Aviation in France.

On January 31, 1957, petitioner entered into another agreement with Engineering Research (the foreign rights agreement) under which petitioner and Engineering Research agreed to divide, equally, royalties with respect to products developed by petitioner or licensed to it by others, and Engineering Research retained the foreign rights with respect to certain patents controlled by it. This agreement expired on January 31, 1967.

Geoffrey R. Simmonds was hired as president and chief executive officer of petitioner in September 1958, following the death of William R. Enyart (who had owned 75 percent of petitioner's stock and had managed petitioner since 1941). Geoffrey Simmonds was Sir Oliver's son. Geoffrey Simmonds believed petitioner was seriously undercapitalized. He decided to

---

[2]Petitioner entered into a separate sales agreement, dated Mar. 19, 1958, with Simmonds Aerocessories of Canada, Ltd. (SAC), which was controlled by Sir Oliver. SAC would purchase merchandise from petitioner at a discount of no more than 10 percent, which it then sold to its customers in Canada. This arrangement was not terminated by the May 20, 1960, agreement, *infra* at p. 107.

[3]The agreement provided for a 10-percent commission with respect to "business in the house or already quoted on and subsequently obtained on the basis of said quotes or repeats of such business at substantially the same price." Other business was to be at a commission rate to be agreed upon, but Sir Oliver testified that the rate agreed upon would be, in fact, 10 percent.

raise capital by offering petitioner's shares for sale to the public, and he decided to work with Shearson, Hamill & Co. (Shearson) to accomplish this. Shearson initially believed that petitioner could raise approximately $1,500,000 of working capital in a public offering, based on going public at $10 to $11 per share. Following a reaudit of petitioner's financial statements completed in March 1960, however, Shearson decided on an offering price of between $5 and $6 per share.

When Shearson became aware of petitioner's contractual obligations to Sir Oliver's companies, Engineering Research and Twenty First Century, it advised petitioner that petitioner would have to eliminate those agreements before the company went public. Shearson believed that the relationship between petitioner and Sir Oliver's companies would adversely affect the underwriting and would give the appearance of insider dealing. Accordingly, Shearson recommended that petitioner acquire the patents and other agreements.

Shearson's first suggestion was to give Sir Oliver 45,000 to 50,000 shares, representing approximately 8 percent of the shares which would be outstanding after the proposed public offering, to terminate the agreements. Sir Oliver rejected this proposal because it was based upon the minimums which would be paid under the agreements and did not account for future growth. Shearson revised its proposal to offer Sir Oliver roughly 60,000 shares, representing about 12 percent of the stock after the public offering, with options to acquire an additional 6 percent (roughly 30,000 shares). While Sir Oliver would have preferred options for 50,000 shares, he did not wish to block the needed public offering of the company (in which he held nearly a 25-percent equity interest) over this matter, so he accepted the revised offer.

On May 20, 1960, Sir Oliver, Engineering Research, Twenty First Century, E.F.G., Ltd. (another of Sir Oliver's Bahamian corporations), and petitioner entered into an agreement pursuant to which the prior agreements between the parties were terminated and the United States patents licensed thereunder were transferred to petitioner. In exchange, petitioner issued 61,358 shares of its common stock and options to purchase 29,165 additional shares of common to Sir Oliver on May 20, 1960. At the direction of Sir Oliver, 19,960 of such shares were issued to his corporation Materia, and the balance were issued to him. The

rights to purchase the 29,165 additional shares (the options) were exercisable at a price equal to the initial public offering price. Petitioner reserved 29,165 shares of its common stock for issuance upon exercise of the options.

Petitioner's net sales and income for the 3 years prior to 1960 were as follows:

|  | 1957 | 1958 | 1959 |
|---|---|---|---|
| Net sales | $6,232,948 | $6,722,338 | $7,261,779 |
| Net income | 97,459 | 65,476 | 119,019 |

Reduced volume of sales and high start-up expenses in the first 4 months of 1960, in which petitioner's net sales were $1,798,566, resulted in a net loss of $63,443 during that period. The comparable sales and income figures during that period in 1959 were $2,546,927 and $105,386, respectively. The reduction in sales was due primarily to a substantially lower volume of Government orders for fuel injection systems; roughly 80 percent of petitioner's business during 1955 through 1959 was with the U.S. Government and the Government's prime contractors. Petitioner's backlog of orders on May 31, 1960, was almost identical in amount and percentage of Government business to that on May 31, 1959.

On June 7, 1960, 112,500 shares of petitioner's common stock were sold to the public in its first public offering at $5.50 per share.[4] While prior to May 20, 1960, petitioner and Shearson discussed an initial public offering price in the range of $5 to $6 per share, the actual initial offering price of $5.50 per share was not set until late in the afternoon of June 6, 1960, the day prior to the public offering.

The initial issue price of $5.50 proved to be a conservative estimate of the stock's value by Shearson. On June 9, 1960, petitioner's common stock had a bid price of $7.75 and an asked price of $7.875. During the period of July through September 1960, the stock had a bid price ranging from $6 to $9, and an asked price ranging from $6.375 to $9.50.

Sir Oliver's options were not immediately exercisable in full. Sir Oliver could purchase up to 1,165 shares during the 1-year

---

[4]Of the 112,500 shares, 100,000 were issued by petitioner, and 12,500 were offered by Geoffrey Simmonds. Following this public offering, petitioner had 500,000 shares outstanding. The par value of these shares was $1 per share.

period commencing September 1, 1960, and 7,000 additional shares during each of the 1-year periods commencing September 1, 1961, 1962, 1963, and 1964. The options could be exercised cumulatively, i.e., any shares not purchased during the particular 1-year period during which they became available could be purchased during the remaining term of the options. The options expired September 1, 1970.

Under the terms of the May 20, 1960, agreement, the options and shares of stock received by Sir Oliver could not be assigned by him if such assignment constituted a public offering within the meaning of the Securities Act of 1933. Sir Oliver could make a "private" sale of options or stock provided that such sale was not under circumstances which would reasonably indicate that the shares or options were being purchased from Sir Oliver with a view to a public distribution in the United States or circumstances which would cause petitioner to be in violation of the Securities Act of 1933; further, any purchaser would be subject to all restrictions under the securities laws of the United States, including the restrictions on public offerings within the meaning of the Securities Act of 1933.

In order for the recipient of any shares received pursuant to exercise of the options to dispose of them in a public offering, the shares would have to be registered and the expense of such registration borne by the recipient. Sir Oliver could request, with respect to two offerings, that petitioner prepare registration statements at his expense in connection with such disposition. This right to request the registration statements was "exercisable only by or with the express written consent of [Sir Oliver]."

The options contained anti-dilution provisions which provided that the holder of the options would receive additional shares at a reduced exercise price in the event that petitioner issued additional shares, securities convertible into additional shares, or options exercisable for its common stock, at a price below the exercise price of the options then in effect. In addition, the number of shares covered by the options would increase in accordance with any stock split or dividend.

As a result of a 3-for-1 stock split in 1966 and a 3-for-2 stock split in 1967, the number of shares subject to the options increased to 131,242 shares at an adjusted price of $1.22 per share.

As of June 7, 1960, petitioner had followed a policy of retaining all of its earnings to finance its growth and planned to continue this policy as long as its growth required such retention.

On December 18, 1967, Sir Oliver transferred the options to Balmoral Hotels, Ltd. (Balmoral). Balmoral was a Bahamian corporation wholly owned by Sir Oliver. Its business was the ownership of a resort hotel in Nassau, Bahamas.

On January 15, 1968, when the market price for a share of common stock of petitioner was $33.50, Balmoral exercised rights under the options for the purchase of 51,242 shares of common stock. Petitioner issued such shares, receiving $62,515 for them. On October 15, 1968, when the market price for a share of petitioner's common stock was $25.3125, Balmoral exercised its rights under the option to purchase 80,000 shares for $97,600. The amounts received by petitioner in excess of the par value of the shares were treated as additional paid-in capital on petitioner's books. The fair market value of the 131,242 shares of common stock issued by petitioner under the options in 1968 was $3,681,607.[5] Balmoral offered most of these shares for sale to the public in 1968 and 1969 in order to finance an expansion of the hotel.

During the period from the date the options were granted until the time they were exercised in 1968, the public market price of petitioner's stock, adjusted for stock splits, ranged from a low of 89 cents per share to a high of $45.62 per share. Petitioner had several public offerings of its shares during this period. The offering price of its common stock sold by certain of its shareholders pursuant to the prospectus dated May 21, 1964, was $7.25 per share.[6] The issue price was $28.875 per share in the prospectus dated October 3, 1967. Additional shares were offered by certain of its shareholders, including Balmoral, in prospectuses dated May 14, 1968, and March 18, 1969. During the period between November 1, 1968, and September 1, 1970, the public

[5]The parties stipulated the value of $3,681,607. Our own calculations reveal a value of the stock issued under the option of $3,741,607, the amount initially claimed by petitioner. The discrepancy is not explained in the record, but we will accept the figure stipulated by the parties.

[6]This offering was prior to the stock splits. The price does not reflect the subsequent splits. Such adjustment reduces the comparable price to $1.61 per share.

market price of petitioner's stock ranged from a low of $3.875 per share to a high of $33.50 per share.

In the late 1950's and early 1960's, petitioner attempted to make projections of its sales. Petitioner started making 5-year projections, but due to the uncertain marketplace, reduced its forecasts to 3 years. Even then, petitioner's projections were not accurate.[7]

When Geoffrey Simmonds took control of petitioner, his goal was to double petitioner's sales every 5 to 7 years. Petitioner's total net sales (including those of acquired companies) for the years 1960 through 1968 were the following:

| 1960 | $6,198,606 |
|------|------------|
| 1961 | 7,005,536 |
| 1962 | 7,503,478 |
| 1963 | 8,746,068 |
| 1964 | 11,560,472 |
| 1965 | 22,897,507 |
| 1966 | 41,161,000 |
| 1967 | 55,547,735 |
| 1968 | 58,805,915 |

Part of this sales increase resulted from an acquisition program engaged in by petitioner in 1965 through 1968, when it diversified and expanded its operations.

The minimum royalties for the period 1960 through January 15, 1969, before reduction for taxes, which would have been payable to Engineering Research had the October 1, 1956, license agreement remained in effect, were $675,000. In 1960, petitioner's obligation for royalties which would be payable to Engineering Research in excess of $675,000 could be determined only after the results of later years' sales became known.

During the period 1960 through 1968, petitioner's sales of capacitance fuel gauge systems and components were as follows:

| 1960 | $4,326,360 |
|------|------------|
| 1961 | 4,917,748 |

---

[7]Gerald J. McCaul, former executive vice president of petitioner, testified that petitioner's fuel gauge forecast made late in 1960 for 1961 was a million dollars high. The 1962 projection, made at the same time, was $1 million low. Given petitioner's gross sales at that time, the margins of error are significant.

| 1962 | ..................... | $4,276,983 |
| 1963 | ..................... | 6,559,551 |
| 1964 | ..................... | 10,063,000 |
| 1965 | ..................... | 18,546,000 |
| 1966 | ..................... | 28,655,000 |
| 1967 | ..................... | 26,295,000 |
| 1968 | ..................... | 27,420,000 |

In 1965, approximately $5 million of the sales were by Liquido-meter Corp., a competitor acquired by petitioner which was not subject to the prior licensing agreement. Approximately one-third of the full gauge sales in 1966, 1967, and 1968 were by Liquidometer. At a royalty rate of 7.14 percent, petitioner's obligation for royalties on the fuel gauge systems would have totaled over $7 million for the period 1960 through 1968, had it not purchased the patents.

Petitioner's instrument systems division in Vergennes, Vt., manufactured all of petitioner's capacitance fuel gauge systems and their components, other than those manufactured by Liquidometer. Petitioner's sales outside of the United States and Canada of products produced by this division in Vergennes for the period 1960 through 1968 totaled $5,987,000. Had the May 20, 1960, agreement not terminated the sales commission agree-ment, and had the commission agreement been extended beyond its January 31, 1962, expiration date, petitioner would have paid a sales commission of roughly 10 percent of those sales, i.e., $598,700, to Twenty First Century. Twenty First Century would have been entitled to $102,900 in commissions for 1960 and 1961. In accordance with the May 20, 1960, agreement, however, petitioner did not pay Twenty First Century any commissions with respect to sales made by petitioner outside of the United States and Canada after December 31, 1959.

In 1960, petitioner's obligation for royalties which would be payable to Engineering Research under the royalty and foreign rights agreements could be determined only after the results of a particular later year's sales became known, as was the case with the sales commission obligation to Twenty First Century.

On its Federal income tax return for 1960, petitioner's original cost basis for the property it received pursuant to the May 20,

1960, agreement included only the value of the stock issued to Sir Oliver in 1960, which it determined to be $337,469.[8] The basis reported on the 1960 return did not take into account petitioner's obligation to issue additional shares upon exercise of the options. Of this cost, petitioner allocated $37,500 to the sales commission agreement, because it estimated its liabilities under it to be $40,000 through January 31, 1962. It allocated $299,969 to the licenses and patents. Nothing was allocated to the foreign rights agreement because, in 1960, petitioner was not able to estimate its future dollar obligation, although it did anticipate that it would be substantial.

Petitioner amortized the 1960 cost attributable to the licenses and patents over a 17-year period beginning in 1960. In 1953, petitioner had obtained rights from Engineering Research which enabled it to enter into a cross-licensing arrangement with Minneapolis Honeywell. Since one of the important patents obtained under the arrangement was issued in 1960, petitioner's accountants (Peat, Marwick, Mitchell & Co.) advised it to amortize the cost of the May 20, 1960, agreement over the 17-year period commencing with the issue of the Minneapolis Honeywell patent. A basic patent owned by Minneapolis Honeywell and cross-licensed to petitioner expired in 1968; certain related and improvement patents expired later.

The latest expiration date of the patents transferred to petitioner pursuant to the May 20, 1960, agreement was January 15, 1969. The patents expiring on that date were Patent No. 2,582,400 and Reissue Patent No. 24,082; the latter was essential to petitioner in the manufacture of its fuel gauging systems in 1960 and throughout the 1960's. Petitioner believed that while its patents may have protected its competitive position, their expiration would not have a material adverse effect on its position which was then based on its accumulated experience and technical knowhow.

Petitioner was actively engaged in research and product development, for both new and improved products, during the late 1950's and 1960's. It held patents on its own prior to 1960, and obtained new and improvement patents subsequent to the May 20, 1960, agreement. In 1960, it was not possible to

---

[8]This amount is the product of the number of shares issued (61,358) times the original issue price of $5.50 per share.

determine which patent transferred to petitioner pursuant to the May 20, 1960, agreement would eventually be the most valuable.

On its Federal income tax return for 1968, petitioner treated the difference between $3,741,607 (the aggregate fair market value of 131,242 shares of its stock on the dates of exercise of the options) and the aggregate exercise price of $160,115, or $3,581,492, as an additional cost to be amortized. For 1968, petitioner claimed a deduction for amortization of nine-seventeenths of this additional cost, or $1,896,084, on its income tax return. For each of the years 1969, 1970, and 1971, petitioner deducted as amortization of the patents one-seventeenth of petitioner's additional cost, or $210,676 per year.

By amended petition, petitioner claims that because the latest expiration date of the patents transferred to petitioner under the May 20, 1960, agreement was January 15, 1969, the difference between the fair market value of its stock when the options were exercised and the exercise price is deductible in 1968. Alternatively, it asserts its original position. It also asserts a third alternative, namely, to deduct the portion of the difference related to compensation (the sales commission agreement) in 1968, and the portion relating to property (patents and foreign rights) one-ninth in each of the years 1968 through 1976.

On March 13, 1978, petitioner filed a motion for partial summary judgment, on the issue presented herein, of whether it is entitled to the patent amortization deductions claimed on its 1968 and 1969 returns. Following briefs and oral arguments, this Court denied that motion in a memorandum sur order dated September 6, 1978, because we could not hold as a matter of law that the options had no value or that their value could not be ascertained.

## ULTIMATE FINDING OF FACT

The options had no readily ascertainable fair market value on May 20, 1960.

## OPINION

Petitioner sought to obtain needed capital by entering into a public offering of its stock. The underwriting firm determined that petitioner would have to terminate its agreements with Sir Oliver Simmonds and his wholly owned corporations which

provided for payment of royalties on patents and payment of sales commissions for sales outside the United States and Canada. On May 20, 1960, petitioner terminated its agreements with Sir Oliver and his companies and acquired the patents and other rights in exchange for 61,358 shares of common stock and options to purchase 29,165 additional shares at their initial offering price (which turned out to be $5.50). The options were exercised in 1968 when the stock of petitioner had appreciated considerably.

The issue presented herein involves the proper method to determine the depreciation allowable upon the patents and other rights obtained in the May 20, 1960, agreement. Section 167(a)[9] authorizes as a depreciation deduction "a reasonable allowance for the exhaustion, wear and tear (including * * * obsolescence) of property used in the [taxpayer's] trade or business." Patents constitute intangible property which may be the subject of a depreciation allowance (amortization) under this section over their useful lives, as do the sales commission and foreign rights agreements. Sec. 1.167(a)–3, Income Tax Regs.

Section 167(g) (which was designated as section 167(f) in 1960), specifies the basis for depreciation:

The basis on which exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be the adjusted basis provided in section 1011 for the purpose of determining the gain on the sale or other disposition of such property.

Section 1012, when read with section 1011, provides that the adjusted basis of the property is its "cost." Where property is acquired by a corporation in exchange for its own stock, the courts have uniformly held the cost basis of the property so acquired is the value of the stock given up in that exchange. See *Pittsburgh Terminal Corp. v. Commissioner*, 60 T.C. 80, 87 (1973), and cases cited thereat. The same principle applies with respect to options to acquire stock. The issue presented is when and how we determine that value.

Where the taxpayer purchases a patent for a noncontingent, fixed amount, that total purchase price constitutes the basis on which depreciation may be taken. *McCullough Tool Co. v.*

---

[9]All section references, unless otherwise indicated, are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.

*Commissioner*, 33 T.C. 743 (1960), affd. 318 F.2d 790 (9th Cir. 1963). Cf. sec. 1.167(a)–6(a), Income Tax Regs. If, however, the sales price of a patent is expressed by a formula by which a fixed dollar amount cannot be ascertained until future years (such as royalties which are a fraction of sales), the purchaser may deduct each year as depreciation only the amount of the purchase price actually paid or payable. *Newton Insert Co. v. Commissioner*, 61 T.C. 570 (1974), affd. per curiam 545 F.2d 1259 (9th Cir. 1976); *Associated Patentees, Inc. v. Commissioner*, 4 T.C. 979 (1945).

Respondent argues that while it may have been difficult, the options could have been valued in 1960 when they were granted and the underlying shares were reserved. He contends that the options were worth between $1.85 and $2.70 per associated share at that time, and should have been depreciated over the average remaining life of the patents obtained; this period would have ended in 1966, prior to the years in issue. Petitioner argues that due to the circumstances under which the options were issued (in lieu of only stock), the nature of the rights transferred by Sir Oliver, and the company's uncertain future, the fair market value of the options was not ascertainable with fair certainty in 1960. It argues that we should, therefore, hold the transaction open and not finally determine its basis in the options until they were exercised in 1968. For the reasons which follow, we agree with petitioner.

Petitioner's position in this case rests upon the "open transaction" doctrine, initially promulgated in *Burnet v. Logan*, 283 U.S. 404 (1931). In *Burnet v. Logan*, the taxpayer sold stock in a mining company for cash and a right to future payments based on the amount of coal mined. Because this "promise of future money payments [was] wholly contingent upon facts and circumstances not possible to foretell with anything like fair certainty" (283 U.S. at 413), the Court concluded that the tax should not be imposed until the taxpayer received payments in excess of basis. The Court recognized that the right to future payments had value because the transferred property had just been valued for estate tax purposes, but held that where there is no necessity for setting a value, the transaction would not be closed. See also *Helvering v. Tex-Penn Oil Co.*, 300 U.S. 481, 499 (1937).

Respondent has attempted to limit *Burnet v. Logan* narrowly

to its facts when to do so serves his interest. It is established that only in rare and extraordinary circumstances will property be considered not to have an ascertainable fair market value. *McShain v. Commissioner*, 71 T.C. 998, 1004 (1979); sec. 1.1001–1(a), Income Tax Regs.; Rev. Rul. 58–402, 1958–2 C.B. 15. This Court has often disagreed with respondent as to whether given circumstances were "rare and extraordinary." E.g., *Estate of Wiggins v. Commissioner*, 72 T.C. 701 (1979); *McShain v. Commissioner, supra*; *Dorsey v. Commissioner*, 49 T.C. 606 (1968).

When dealing with stock options, however, respondent has been less reluctant to find a transaction open. Cf. *Frank v. Commissioner*, 447 F.2d 552 (7th Cir 1971), affg. 54 T.C. 75 (1970). See generally secs. 1.61–15, 1.83–7, and 1.421–6, Income Tax Regs.

Respondent argues that his reluctance to close transactions involving stock options is limited to compensatory options, as opposed to those issued for property (presumably of equal value). He explains that section 1.421–6, Income Tax Regs., protects the employee who is said (by respondent) to receive options under less than arm's-length negotiations, from recognizing ordinary income which he might never realize if the option has been overvalued. The deferral is based in part upon a presumption that unless an option can be freely disposed of by an employee at the time it is granted and has a value the employee can realize, the employer must have intended to compensate the employee by the amount he will be able to realize when and if the value of the underlying stock appreciates to a value in excess of the exercise price (possibly due to the employee's own efforts) rather than by the value of the option at the time of grant. See *Commissioner v. LoBue*, 351 U.S. 243 (1956); *Commissioner v. Smith*, 324 U.S. 177 (1945). Thus, the regulation in that situation looks to the actual exercise of the option when the amount of compensation can be fixed precisely.

These reasons for holding open the valuation of compensatory options under section 1.421–6, Income Tax Regs., apply with equal force in the instant case. The options were granted to Sir Oliver in order to reward him with a larger, speculative stake in petitioner if it should prove successful, while not diluting his equity if it should not. Sir Oliver had already rejected an offer of stock only, which was based upon the minimum payments due

him. It was envisioned at that time that if petitioner became successful, it would probably be due to the use of the patents and rights transferred by Sir Oliver. Thus, any appreciation in the value of the stock over the exercise price, which thereby enhanced the value of the options, was meant to "compensate" Sir Oliver, albeit indirectly, for the royalties and commissions his companies had foregone.

If the options had been valued when issued, and the eventual "cost" (see p. 115 *supra*) to petitioner was more than that value, it would not have recovered its actual cost through depreciation. Yet, it is unquestioned that petitioner is entitled to recover its total cost through reasonable deductions for exhaustion over the period covered by the agreement. *Associated Patentees, Inc. v. Commissioner*, 4 T.C. 979, 985 (1945). Alternatively, if the subsequent cost upon exercise was less than estimated or if the options lapsed, petitioner would have deducted more than the statutory "reasonable allowance." In either case, its income would have been unnecessarily distorted. If we defer valuation until the options are exercised, only the timing, and not the amounts, is distorted.

Petitioner does not claim that the options did not have value when granted Sir Oliver, but only that they did not have a "readily ascertainable fair market value," i.e., one that can be determined "with anything like fair certainty." Petitioner then relies upon certain cases which have applied the open transaction doctrine to cost. *Detroit Edison Co. v. Commissioner*, 131 F.2d 619 (6th Cir. 1942), affd. 319 U.S. 98 (1943); *Associated Patentees, Inc. v. Commissioner, supra*. Respondent would distinguish these cases on the grounds that they involved out-of-pocket costs to the taxpayer.[10] In fact, petitioner's issuance of the shares added $160,115 to capital and paid-in surplus. This distinction is not convincing because as we explained at page 115 *supra*, the value of the stock options given is the cost basis of the property acquired. Cf. *Union Chemical & Materials Corp. v. United States*, 155 Ct. Cl. 540, 296 F.2d 221 (1961). This cost could not be determined until 1968.

Respondent would also distinguish those cases on the grounds that the payments made annually in each of those cases bore a

---

[10]See also *Marcus v. Commissioner*, a Memorandum Opinion of this Court, 30 T.C.M. 1263, 40 P-H Memo T.C. par. 71,299 (1971), affd. per order (3d Cir., Apr. 8, 1974).

direct relationship to the assets acquired. In the instant case, he argues that relating the assets acquired in 1960 to the market price of petitioner's shares in 1968 is "illogical, unrealistic and distorted." We disagree. We note that the parties agreed upon this indirect relationship, recognizing that one or the other might receive a windfall. To the extent appreciation occurred, it was intended by the parties to compensate Sir Oliver for the rights transferred which most likely, but not necessarily, would have been worth more than the minimum if petitioner were successful.

This situation is no different from that which occurs with nonstatutory stock options issued an employee. The bargain struck by the parties was inherently imprecise and speculative in order to placate both sides and reach agreement. Under the circumstances, however, the measure of cost used by petitioner was as direct as was possible; any other solution would also distort income, depending on what eventually occurred. The options agreement definitely obligated petitioner to pay no fixed sum for the rights obtained which would constitute its cost. At a subsequent date, when the options were exercised, the cost became fixed and depreciation could be taken at that time. See *Columbus & Greenville Railway Co. v. Commissioner*, 42 T.C. 834, 848–849 (1964), affd. per curiam 358 F.2d 294 (5th Cir. 1966); *Albany Car Wheel Co. v. Commissioner*, 40 T.C. 831, 841 (1963), affd. per curiam 333 F.2d 653 (2d Cir. 1964).

Respondent next argues that, unlike those cases in which the courts have held transactions open, petitioner's payments for the patents and other rights were fixed at the time of sale. Relying upon *McCullough Tool Co. v. Commissioner*, 33 T.C. 743 (1960), affd. 318 F.2d 790 (9th Cir. 1963), he contends that since payment was not conditioned upon petitioner's use of the patents, there was no reason to postpone the determination of its basis. Our holding in *McCullough Tool* was not based upon whether the taxpayer was required to use the patent, however, but upon the fact that a precise purchase price for the patent rights was fixed by the parties in lieu of royalties.

Respondent also seeks to fix the payment in 1960 because petitioner reserved shares to meet its obligations in the event the options were exercised. This argument is too simplistic and ignores reality. In reserving the shares, petitioner merely obligated itself to retain that number (as adjusted) of authorized

but unissued shares if and when it issued stock in the future. Clearly, this did not fix any cost to petitioner unless a value could be placed on the stock options.

To establish whether the options had an ascertainable fair market value, and if so, the amount thereof, both parties presented the testimony and evaluation reports of expert witnesses. Each of the witnesses was experienced and well qualified, although respondent's expert had no experience in the market conditions existing around the time the options were granted. We have carefully considered the evidence provided by each of the experts in arriving at our decision.

Under the circumstances presented herein, we find that the options could not be valued with fair certainty until they were exercised in 1968. We reach this conclusion because there were too many uncertainties which existed when the options were granted to arrive at a fair market value. The options were never actively traded on an established market. In fact, they were only transferable subject to the requirement that the transfer was not a "public offering" within the meaning of the Securities Act of 1933, 48 Stat. 74. The exercise price was to be the initial public offering price of the stock, yet this price was not known with any certainty (beyond a range of $5 to $6) when the options were granted; the issue price was not set until June 7, 1960. Moreover, the initial issue price did not adequately reflect the fair market value of the stock which had a bid price of $7.75 when it first was listed over-the-counter on June 9, 1960. Cf. *Hazeltine Corp. v. Commissioner*, 89 F.2d 513, 519 (3d Cir. 1937), revg. on this issue 32 B.T.A. 4 (1935). The stock was underpriced by the underwriter, possibly due to petitioner's dismal showing in the first 4 months of 1960.

Furthermore, the stock which would be obtained upon the exercise of the option had shortcomings. The stock would be unregistered, though Sir Oliver did have the nontransferable right to request two registration certificates to be filed for the stock at his expense.[11] Nothing would have prevented petitioner from attempting to dissuade a registration, however, if it came at an inopportune time. Moreover, only 112,500 shares were to be offered to the public in the initial offering. If the options were

---

[11]The mere fact that the shares were unregistered does not preclude a valuation from being made (but see sec. 1.421–6(c), Income Tax Regs.), but is a factor we consider with the others.

exercised and the shares registered, they would have represented over 20 percent of the publicly held shares. These shares would either have been sold at a large discount if sold in large blocks, or commanded a substantial premium if one purchaser desired them.

All of the experts agreed that the long term of the options substantially enhanced their value. Part of this was offset, however, by the delay of 4 years before the options could be exercised in full. They also were optimistic on petitioner's future prospects, although none of them were able to predict petitioner would be as successful as it became. Nonetheless, petitioner did have an erratic earnings history, which was likely to be reflected in the volatile price of its stock in the future. The expected wide variance in the price of the stock also contributes to the difficulty in valuing the options.

Another factor complicating the valuation is the antidilution clause. In addition to provisions protecting against stock splits, the holder was given the right to buy additional shares at a reduced price if the petitioner later issued stock, convertible securities, or options exercisable at less than the exercise price of the options in effect immediately prior to such action. This provided a benefit for the option holder not available to a shareholder if petitioner's stock declined prior to a resurgence. It is a small factor, one which respondent's expert thought totally insignificant, yet it further complicates the valuation.

Despite these factors, respondent's expert witness determined a value for the options of $1.85 to $2.70 per associated share. He based this on what he thought a reasonable investor in 1960 would have offered for the options. He optimistically projected a doubling in petitioner's earnings over the following 3 to 5 years and assumed a constant price earnings ratio. This would have doubled the stock price to the $10 to $12 range (depending on the initial offering price), and the minimum arbitrage value of the options to $4.50 to $6.50 per associated share. He then added a 25-percent premium to account for the long exercise period and estimated an investor would expect to triple his money if he bought the options.

We do not accept respondent's expert's determination. He ignored, or too arbitrarily valued, several factors we have deemed relevant, such as the delay in exercise of the options, the limited transferability of the registration rights, the cost of

having unregistered stock registered, and blockage on the sale of the block of stock or a premium on its purchase. Moreover, he based his constant price earnings ratio on the issue price, rather than the higher market price. In addition, as knowledgeable as he was about valuing small companies in recent times, it is not clear that this witness was aware of financial market conditions in 1960, such as the number of readily available purchasers of the stock represented by the options.

A final problem with this witness's valuation is that it was based solely on the investor's prespective. Fair market value has been defined as the price at which a willing buyer will purchase property from a willing seller, when neither party is acting under compulsion, and both parties are fully informed of all the relevant facts and circumstances. *McShain v. Commissioner*, 71 T.C. 998, 1004 (1979). If the price such a willing buyer would offer is less than such a willing seller would accept, it is impossible to determine with fair certainty the market value of the options, when granted, under the traditional definition of fair market value. *Estate of Wiggins v. Commissioner*, 72 T.C. 701, 713–714 (1979).[12] Such is the case under the circumstances presented herein.

Respondent's witness ignored what a willing seller in Sir Oliver's position would demand. Sir Oliver, directly and indirectly, owned 124,562 of the 500,000 shares (24.9 percent) to be outstanding after the initial public offering. The options were equivalent to 5.8 percent of the shares then outstanding, and over 25 percent of the shares which were publicly held. Sir Oliver was aware of petitioner's promising future and received the options to speculate on these prospects. He merely exchanged one speculative property (the royalties and sales commissions) for another (the options). Since he had previously rejected an offer valued at $450,000 to $550,000 for his interests as inadequate before accepting the 61,358 shares (valued by the parties at $337,469) and the options in their stead, it is unlikely that an offer of $54,000 to $79,000 for the options (a total deal of at most $416,469) would have been acceptable to him.

Petitioner argues that even if we accept the analysis of respondent's expert, the options could not be valued with

---

[12]See also *Altorfer v. Commissioner*, a Memorandum Opinion of this Court, 20 T.C.M. 266, 30 P-H Memo T.C. par. 61,048 (1961).

reasonable accuracy. The difference between the high and low values suggested by respondent is a spread of 45 percent. This range could expand to 75 percent, depending on whether the expected exercise price would be $5 or $6.[13] It is petitioner's position that these ranges are too large to arrive at any single value with fair certainty. It is merely an extension of the argument of one of his expert witnesses, who, after plugging various assumptions into the Black-Scholes Model of options pricing,[14] arrived at possible values for the options ranging from 66 cents to $5.56. He then concluded that because any of these assumptions were reasonable, and the spread so great, no fair market value could be determined with reasonable accuracy. Petitioner then argues that because there is no necessity to value the options in 1960, such as an estate tax, we should defer valuation and the final determination of basis until the precise amount can be fixed.

While we agree with petitioner's ultimate conclusion, we need not adopt the reasoning of his witness. We have set forth several of the reasons why we believe the options cannot be valued. The broad range indicated by respondent's expert's valuation merely reflects the difficulties of valuation. If we relied too heavily on petitioner's expert's method, we would risk never being able to value options; witnesses would simply give us a range of possible, but reasonable, assumptions yielding a wide variety of values. Rather than aiding the Court by giving their opinion of probable value based upon their experience and knowledge, they might unnecessarily hamper the decision making process by offering essentially useless information. The valuation process is already a difficult and time-consuming drain on the Court's resources without this additional complication. See *Buffalo Tool & Die Mfg. Co. v. Commissioner*, 74 T.C. 441 (1980).[15]

Respondent's final argument that the options were capable of being valued on May 20, 1960, rests on the concept that we can

---

[13]Had the exercise price been $5, the minimum arbitrage value in 3 to 5 years would be $5 to $7, which, with the 25-percent premium and a tripling of investment, implies a value of as much as $2.92. If the exercise price were $6, the value of the options under respondent's expert's method would be as low as $1.67. The difference between $1.67 and $2.92 is 75 percent of the lesser figure.

[14]F. Black & M. Scholes, "The Pricing of Options and Corporate Liabilities," 81 J. Pol. Econ. 637 (1973).

[15]See also *Strutz v. Commissioner*, T.C. Memo. 1980–274.

value one side of the transaction by determining the value of the other side. *United States v. Davis*, 370 U.S. 65 (1962); *Philadelphia Park Amusement Co. v. United States*, 130 Ct. Cl. 166, 126 F. Supp. 184 (1954). We note first that it is questionable whether *Davis* applies to an open transation, especially when the value can be fixed at a later date with certainty. *Mitchell v. Commissioner*, 590 F.2d 312, 314 (9th Cir. 1979), affg. 65 T.C. 1099 (1976). Moreover, as a factual matter, we could not determine the value of the rights transferred to petitioner as of May 20, 1960, with any certainty. Petitioner's future obligation for royalties was, in itself, "open." *Dorsey v. Commissioner, supra; Associated Patentees, Inc. v. Commissioner, supra.* Thus, we find *Davis* inapplicable.

We, therefore, find that the fair market value of the options when exercised in 1968 was $3,521,492, which is the value of the stock issued under the options less the exercise price. See page 110 *supra.*

We turn now to the remaining issue—the proper period over which petitioner should amortize its cost for the May 20, 1960, agreement. In 1960, petitioner allocated $37,500 to the sales commission agreement and $299,969 to the licenses and patents. These sums were equivalent to the value of the stock issued at that time; no cost was placed on the options. Petitioner began amortizing the licenses and patents, using the straight-line method over a 17-year period. This period was chosen because Minneapolis Honeywell, which had a cross-licensing agreement with petitioner, had obtained a new patent in 1960, and patents had a 17-year useful life. 35 U.S.C.A. sec. 154 (1974); *Hazeltine Corp. v. Commissioner*, 89 F.2d 513, 520 (3d Cir. 1937).[16]

Petitioner now argues that the initial allocation of cost to the sales commission agreement should apply to the options as well, and that it should be governed by section 1.421–6(d)(4), Income Tax Regs., i.e., it should be written-off in 1968, when the options were exercised. As to the remainder of the agreements terminated, petitioner's primary position is that the proper period for amortization ended on January 15, 1969, when the licensing agreement of October 1, 1956, would have ended. Thus, that

---

[16]We infer from the record that the portion of cost (of the stock initially issued) attributable to the sales commission agreement was completely amortized by Jan. 31, 1962, when the agreement would have expired.

portion of the additional cost incurred on January 15, 1968, should be amortized over the January 15, 1968, to January 15, 1969, period; and the balance should be amortized over the October 15, 1968, to January 15, 1969, period, because January 15, 1969, ended its remaining useful life. See sec. 1.167(a)–6, Income Tax Regs.

We do not believe that section 1.421–6, Income Tax Regs., applies to the sales commission agreement. Sir Oliver served in no position with petitioner that would qualify as an employer-employee relationship within the meaning of section 1.421–6(b)(2), Income Tax Regs. Compare *Frank v. Commissioner*, 54 T.C. 75, 86–88 (1970), affd. 447 F.2d 552 (7th Cir. 1971). The consideration was given Sir Oliver in exchange for terminating the sales commission agreement between petitioner and Twenty First Century, i.e., Sir Oliver exchanged one proprietary interest for another. There is no question of an intent to exchange a proprietary, as opposed to compensatory, interest in return for services. See *Commissioner v. LoBue*, 351 U.S. 243, 247 (1956).

While we disagree with petitioner in determining how additional cost is to be attributed to the sales commission agreement, we do agree that some of it is properly allocable to the agreement. Although petitioner may have initially estimated commissions owing during the remainder of the agreement to be $40,000, we do not think this is conclusive. Sir Oliver made it clear that he, on behalf of Twenty First Century, would have had no objections to extending the sales commission agreement beyond its January 31, 1962, expiration. Thus, given his relationship with petitioner, we have found as a fact that its renewal was probable and cannot find the contractual date determinative. We are convinced by the evidence presented that the sales commission agreement would have remained in effect at least until the patents owned by Sir Oliver's corporations and the corresponding licensing agreements expired. Given Sir Oliver's advanced age, however, we doubt that it would have been expected (in 1960) that the agreements would continue much beyond that time. Thus, we find that the sales commission agreement has a useful life extending until January 15, 1969, when the last patent owned by Sir Oliver's corporations and the licensing agreements would have expired.

We need not allocate what portion of the total cost of the options is attributable to the sales commission· agreement

because we think January 15, 1969, is also the appropriate useful life for the licenses and royalties obtained. Respondent would have us spread the cost or value of the group of patents acquired over the average useful life of all the patents acquired. *Lanova Corp. v. Commissioner*, 17 T.C. 1178, 1185 (1952). See also *Kraft Foods Co. v. Commissioner*, 21 T.C. 513, 593 (1954). Under his theory, the 17-year period ended in 1966.[17]

Respondent acknowledges that there is also support for determining the expiration of the most significant patent of a group and computing the 17-year period from that date. *Hazeltine Corp. v. Commissioner*, 32 B.T.A. 4, 19 (1935), affd. on this issue 89 F.2d 513, 521 (3d Cir. 1937). Cf. *Heberlein Patent Corp. v. United States*, an unreported opinion (S.D. N.Y. 1938, 23 AFTR 1132, 1133, 38–1 USTC par. 9182), affd. on another issue 105 F.2d 965 (2d Cir. 1939). See *National Piano Manufacturing Co. v. Commissioner*, 11 B.T.A. 46, 61 (1928), affd. 50 F.2d 310 (D.C. Cir. 1931). Given the importance of Patent No. 2,582,399 and its Reissue Patent No. 24,082 to petitioner in 1960 (and subsequently), we think the latter rule is more appropriate in this case. Based on the record, the only other patent which approached it in importance was the Minneapolis Honeywell patent used under the cross-licensing agreement, which expired in 1968, as opposed to the January 15, 1969, expiration of the patent petitioner purchased. Respondent's argument that the expiration of the reissue patent is determinative is flawed because the reissue patent continues only for the unexpired term of the original patent. 35 U.S.C.A. sec. 251 (1954).[18] Thus, they both expire on January 15, 1969, and it is this date which terminates the useful life of the portion of the May 20, 1960, agreement attributable to the licenses and royalties. In any case, the licensing agreement expired by its own terms on that date.

The remaining agreement terminated pursuant to the May 20, 1960, agreement was the foreign rights agreement. This agreement was to have expired on January 31, 1967. In 1960, petitioner allocated no specific amount to this agreement

---

[17]We question the method used by respondent to determine the average expiration date. He merely took the mean of the earliest and latest patents, rather than a weighted average. Given our decision, however, this matter need not be resolved.

[18]Respondent erroneously argued that the reissue patent had a 17-year life of its own, which would not have expired until Nov. 1, 1972.

because it had no basis upon which to make an estimate. It urges us to allocate no amount to it now.

While it is likely that the foreign rights agreement had some value, petitioner may have determined in 1960 that this value was so speculative that it would be valued at zero. Respondent has not challenged this allocation of zero to the foreign rights agreement,[19] and we have no evidence in the record with which to make any better allocation. We reluctantly accept petitioner's allocations of zero to the foreign rights agreement. Thus, the entire cost to petitioner for the options is to be amortized over the period between the exercise of the options and January 15, 1969.

*An appropriate order will be issued.*

---

[19]In the deficiency notice, respondent referred to the "amortization of patents." On brief, he argues similarly and does not challenge petitioner's allocation of no cost to the foreign rights agreement.