SANDVIK, INC., SUCCESSOR IN INTEREST TO DISSTON, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sandvik, Inc. v. Commissioner
Docket No. 13076-78.
United States Tax Court
T.C. Memo 1986-588; 1986 Tax Ct. Memo LEXIS 19; 52 T.C.M. (CCH) 1181; T.C.M. (RIA) 86588; December 17, 1986. Thomas D. Wright,Dale Hershey, and Richard I. Halpern, for the petitioner. Russell F. Kurdys and Donald W. Howser, for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined deficiencies in petitioner's Federal income tax as follows: Taxable Year Ending
Amount
December 31, 1972
$1,039,916
December 31, 1973
1,641,725
December 31, 1974
2,263,589
December 31, 1975
425,339
February  6, 1976
267,031
*20 After concessions, the issue for decision is the fair market value of certain intangible assets, specifically patents, investment in subsidiaries and goodwill as of February 29, 1972. For reasons of convenience, we have combined our findings of fact and opinion. Some of the facts have been stipulated and are found accordingly. The stipulation of facts and exhibits are incorporated herein by this reference. This case involves deficiencies in income tax originally determined against Disston, Inc. (hereinafter sometimes referred to as Disston), a corporation organized and existing under the laws of the State of Delaware, with its principal office and place of business at Greensboro, North Carolina at the time it filed the petition in this case. By merger effective December 29, 1978, which occurred after Disston's commencement of this case, Disston was merged into Sandvik, Inc. Upon such merger, Sandvik, Inc. succeeded to all of the business, assets and liabilities of Disston. Prior to the trial of this case, Sandvik, Inc., was substituted for Disston, as the named petitioner and will be referred to hereinafter as petitioner. Petitioner is a corporation organized and existing *21 under the laws of the State of Delaware, with its principal office and place of business in Fair Lawn, New Jersey. Disston was the corporation to which H.K. Porter Company, Inc. (hereinafter referred to as Porter) transferred as of February 29, 1972 the assets of what had been Porter's Disston Division. The Disston Division, which traced its origin to 1840 when Henry Disston first began the manufacture of handsaws, manufactured in addition to saws other hand tools, including cordless electric grass shears, for the consumer market and cutting tools, principally saws and knives, for the industrial market. The Disston Division also produced specialty steel items, files, measuring tapes and rules. Related to the assets of the Disston Division was stock in Canadian subsidiaries of Porter which engaged in the manufacture and sale of cutting tools and blades. In the fall of 1971, management of Porter turned its attention to a public offering of the stock of a corporation to contain the assets of the Disston Division. At the direction of Mr. Thomas Mellon Evans, Chairman and controlling shareholder of Porter, officers of Porter including John W. Puth, Vice President and General Manager *22 of the Disston Division, and Mr. Joseph N. Yorke, Vice President-Finance of Porter, met on October 20, 1971 in New York with representatives of Merrill Lynch, Pierce Fenner & Smith, Inc. (hereinafter referred to as Merrill Lynch). By mid-December 1971, Porter, Merrill Lynch and their respective representatives had begun work preparing the documentation to accomplish Porter's transfer of the assets of the Disston Division and related foreign subsidiaries to Disston, Inc. and the public offering of the stock of Disston, Inc. The transfer of assets from Porter to Disston was made pursuant to two key documents, both of which were entitled "General Conveyance and Assumption of Liabilities" and recited effective dates as of January 1, 1972. One of those agreements was between Porter and Disston and is hereinafter referred to as the "Porter Conveyance." In broad outline, the Porter conveyance states that (1) Porter transferred to Disston all of the assets of the Disston Division and all 253 shares of capital stock of Porter's first-tier Canadian subsidiary, Jean-Paul Ruel, Inc., in exchange for 1,875,000 shares of Disston's $1.00 par value Common Stock and Disston's assumption of specified *23 liabilities and (2) Porter caused its wholly-owned, first-tier Canadian subsidiary, Disston (Canada) Ltd. (formerly named H.K. Porter Company (Canada) Ltd.) to transfer to Disston 99.02 percent of the outstanding voting shares of Porter's second-tier Canadian subsidiary, Shurly-Dietrich-Atkins Company, Limited, (comprised of 148,000 shares of common stock and 6.11 shares of preferred stock) in exchange for 125,000 shares of Disston's common stock. The Porter Conveyance contained no recitation or agreement as to the fair market value of any of the items of property exchanged by the parties to that agreement. One line of business conducted by Disston (Canada) Ltd. was a consumer hardware business which was to be transferred to, or to the control of, Disston. The second "General Conveyance and Assumption of Liabilities," states that Disston (Canada) Ltd. transferred the assets of that consumer hardware business, subject to liabilities, to Shurly-Dietrich-Atkins Company, Limited, in exchange for 3,202 newly issued shares of common stock of Shurly-Dietrich-Atkins. Those shares were among the 148,000 shares transferred to Disston pursuant to the Porter Conveyance. The Board of Directors *24 of Porter in a meeting on January 28, 1972 where it ratified the execution of the Porter Conveyance ratified the assignment to it of the 125,000 shares of Disston received by its subsidiary Disston (Canada) Ltd. under the Porter Conveyance for the stated consideration of cancellation of Disston (Canada) Ltd.'s indebtedness to Porter in the amount of $1,080,000 and for the further stated consideration of the issuance of a promissory note to Disston (Canada) Ltd. in the amount of $663,750. The necessary documents including an amended registration statement providing for a public offering price of $17.00 per share for the Disston common stock, and a prospectus were filed with the Securities and Exchange Commission (SEC). Arthur Anderson & Co. audited the accounts of Porter and Disston and prepared the financial statements in the prospectus. The offering commenced on February 24, 1972, and orders to purchase the entire offering were received within a matter of hours. During the course of the closing on March 2, 1972, the Porter personnel in attendance delivered to the several underwriters a stock certificate representing 1,980,000 shares (or 99 percent) of Disston's voting common *25 stock and delivered certificates for the remaining 20,000 issued and outstanding shares of Disston's stock (1 percent) to three of Disston's officers, Messrs. John W. Puth, John M. Dixon and R. William Metzger. In exchange, Porter received from Merrill Lynch and the three Disston officers checks for the proceeds of sale of the shares as reduced by applicable underwriting discount but without reduction for Porter's other expenses of the offering. The gross value of the Disston shares sold by Porter was $34,000,000.00 (2,000,000 shares X the $17.00 per share public offering price). Following the offering, the common stock of Disston was listed for trading on the New York Stock Exchange. The following table sets forth the NYSE closing prices for shares of Disston common stock on the last trading day of each month from April 1972 through December 1975: SCHEDULE 1
1972
1973
1974
1975
January
16
14
7-1/4
February
13-7/8
14-7/8
6-5/8
March
17-7/8
14-1/2
8-1/8
April
19-3/8
14-3/8
15-1/4
7-1/8
May
24
12-3/8
15
7-1/2
June
23-1/4
12-1/2
14-3/4
7-7/8
July
22-3/8
16-1/8
11-1/8
6-7/8
August
21-1/8
14-5/8
5-3/4
6
September
19-7/8
21-3/8
4-3/4
5-5/8
October
21-3/4
17-1/8
5-1/2
5-1/2
November
18-1/2
11-7/8
6-1/4
6-3/8
December
18-3/8
12
5-3/8
6-1/8
*26 Approximately two years before the offering of Disston stock, Porter had caused to be filed, on October 23, 1969 and November 7, 1969, respectively, applications for a design patent (No. DES 219,950) and a mechanical patent (No. 3,623,223) covering cordless electric grass shears. In late 1969 and early 1970, Porter commenced marketing the cordless electric grass shears while patents were pending. There was no competition for Porter's cordless electric grass shears from Porter's entry into the market until late 1971. The grass shears gained immediate commercial success as shown by the following table of the number of cordless electric grass shear units sold by the Disston Division and the gross dollar sales of such units to distributors for the calendar years 1969, 1970 and 1971: Number of Grass
Gross Sales ($ )
Year
Shear Units Sold
Grass Shears
1969
6,990
153,430
1970
249,979
5,464,272
1971
460,229
8,618,285
The Disston Division's sales of consumer products, which included the cordless electric grass shares, increased as a percentage of the total sales of the Disston Division and Porter's related foreign subsidiaries from 49 percent *27 in 1969 to 64 percent in 1971. Profits from consumer products including the cordless shears accounted for 76 percent and 78 percent, respectively, of income from operations for 1970 and 1971. In 1971 the income of the Disston Division and related foreign subsidiaries before provision for taxes, $3,950,000, was more than twice that in 1969, $1,886,000. Net income increased from $722,000 in 1969 to $1,034,000 in 1970 and $1,983,000 in 1971. This increase for 1970 and 1971 was primarily attributable to sales of the cordless electric grass shears. During the summer of 1971 Porter was aware that other consumer hardware producers, particularly Sunbeam Corporation (Sunbeam) and Black and Decker Manufacturing Company (Black & Decker), intended to offer for sale lines of cordless electric grass shears. In letters to Sunbeam dated July 8, and September 29, 1971 and in a letter to Black and Decker dated November 24, 1971 Porter advised that Porter's mechanical patent was pending, that certain claims of Porter's patent application had already been allowed and that, in Porter's view, the competitors' shears duplicated features of the Porter shears and would infringe Porter's mechanical patent *28 when issued. Furthermore, Porter communicated that upon issuance of the mechanical patent it would assert its patent rights. On February 23, 1971, the design patent, U.S. Design Patent No. DES 219,950 was issued and on November 30, 1971, the mechanical patent (U.S. Letters Patent No. 3,623,223) was issued by the U.S. Patent Office to Porter. The summary of the invention as stated in the patent provides in part as follows: The invention resides in providing a lightweight, portable, battery powered, cordless type grass shear having a pair of toothed blades formed of strips of thin, flexible, plate metal coated to reduce friction and in which each tooth of the upper blade is independently and sufficiently flexible to allow a tough grass blade to be caught and bent between an upper and a lower tooth so that such teeth may slide over such tough grass blade without jamming or stopping cutting action of the other teeth pending withdrawal of the grass blade and a further attempt at a different angle of cutting. The references cited in the patent are as follows: UNITED STATES PATENTS
2,652,626
9/1953
Dutcher
30-220 X
3,049,802
8/1962
Bork
30-221 X
3,212,188
10/1965
Riley
30-216
3,218,710
11/1965
Bruck
30-222
*29 On the same day as the mechanical patent was issued, Porter, by its attorneys Lawrence F. Scinto and Fitzpatrick, Cella, Harper and Scinto of New York City, instituted court actions in the Federal District Court for the Northern District of Illinois against Black and Decker Manufacturing Company and Sunbeam Corporation for infringement of the mechanical patent and the design patent covering the cordless electric grass shears manufactured by the Disston Division. On December 23, 1971, Black & Decker by its counsel William A. Van Santen, Don Harness and others, filed an answer to Porter's complaint denying infringement of the Porter patents by any of its products and alleging that the Porter patents were invalid for a variety of reasons including that the subject matter of the Porter patents was obvious in view of the prior art. Black and Decker also alleged that Porter was guilty of unclean hands rendering its mechanical patent unenforceable for the reason that it did not inform the patent office of pertinent prior art known by Porter or its representatives. Black and Decker included a counterclaim on the basis that Porter was infringing a patent owned by Black and Decker. Sunbeam *30 filed an answer on January 31, 1972 also denying the infringement allegations and claiming that the Porter patents were invalid. The existence of Porter's patent litigation against Black and Decker and Sunbeam was disclosed in the prospectus for the public offering of Disston stock. The prospectus stated in relevant part: While in the opinion of Messrs. Fitzpatrick, Cella, Harper and Scinto, special counsel to the Company [Disston] in these proceedings, based upon the facts presently known at this stage in the litigation, the Company's claims have a reasonable likelihood of success and Black and Decker's counterclaim appears to be without merit, the outcome of these suits is uncertain and there is no assurance that the Company will ultimateey be successful or that the validity or enforceability of the Company's patents will be upheld or that Black and Decker's counterclaim will be dismissed. An adverse outcome as to the validity or enforceability of the company's patents or of the aforesaid counterclaim of Black and Decker could have a material adverse effect on the company's earnings. In conjunction with the SEC filings for the offering the Fitzpatrick, Cella firm prepared *31 and furnished a written legal opinion, dated February 1, 1972 and an abbreviated version of that opinion dated February 2, 1972. The opinion of the Fitzpatrick, Cella firm of the validity of Disston's patents and the infringement by Sunbeam and Black and Decker was expressed in the abbreviated February 2, 1972 opinion as follows: In our opinion, both the Sunbeam cordless electric grass shear and the Black and Decker cordless electric grass shear embody the aesthetic or ornamental features of Porter's Design Patent No. D-219,950, although there are minor variations. In like manner, based upon present information, both the Sunbeam shear and the Black and Decker shear, in our view, infringe claims of Porter's U.S. Patent No. 3,623,223. Both Sunbeam and Black and Decker have filed answers in the litigation denying the allegations of infringement and challenging the validity of Porter's patents upon a number of grounds, including the usual defense of "obviousness" under 35 U.S.C. § 103. At this stage of the litigation no discovery has as yet been had as to the basis for the defendants' assertions of non-infringement and patent invalidity, but based upon the *32 facts presently known to us, defendants' assertions of patent invalidity do not appear to us to be well founded. Each of the opinions prepared by the Fitzpatrick, Cella firm was addressed to John Puth, President of Disston. While the language in the prospectus was guarded with respect to the outcome of the litigation, in accordance with the usual practice of securities underwriters to avoid optimistic predictions in uncertain situations in order to minimize liabilities under the securities laws, the verbal indications to John Puth and other institutional investors from the patent counsel was highly favorable and they anticipated a positive outcome to the litigation. On May 22 and 23, 1972, Disston was added as a partly plaintiff as it now held title to the patents. Prior to October 13, 1972, Black and Decker made a settlement offer to Disston of a 5 percent royalty rate on the shears sold by Black and Decker subject to a limit of $500,000. Disston rejected this offer as being too low. Black and Decker dropped its counterclaim of infringement shortly before trial because counsel for Black and Decker found additional prior art which covered the subject matter of its patent which *33 it was attempting to enforce. On June 28, 1974, the trial judge in U.S. District Court for the Northern District of Illinois issued his opinion in H.K. Porter Co. v. Black and Decker Manufacturing Co.,182 U.S.P.Q. 401 (N.D. Ill. 1974), in which he concluded that the patents in question were invalid because of obviousness. Prior art cited in the opinion include corded shears made by General Electric and Rockwell as well as the Riley patent cited by the U.S. Patent Office disclosing a cordless device. The court found that failure of Disston to call the pertinent prior art to the attention of the U.S. Patent Office did not constitute fraud. It also dismissed an antitrust counterclaim asserted by Black and Decker. Cross appeals were taken and on July 11, 1975, the U.S. Court of Appeals for the Seventh Circuit affirmed in all respects the decision of the district court below. H.K. Porter Co. v. Black and Decker Manufacturing Co.,518 F.2d 1177 (7th Cir. 1975). On October 11, 1975 the decision became final. Patchin Appraisals, Inc., of Minneapolis, Minnesota, (Patchin) performed an appraisal of the assets which Porter transferred or caused to *34 be transferred to Disston and prepared a three-volume report entitled "Appraisal" dated October 13, 1972. Patchin determined and reported in the Appraisal that as of February 29, 1972, the fair market value of the grass shear patents was $16,000,000 and the sum of the fair market values of Disston's assets less liabilities was $36,363,567. The following schedule sets forth the values of Disston's original assets by category as appraised by Patchin and the ratable apportionment of tax basis under section 1.167(a)-5, Income Tax Regs., computed by Disston to arrive at the tax basis used in preparing Disston's 1972 and 1973 Federal income tax returns. Patchin
Tax Basis for 1972-73
Appraised
Returns Apportionment
Asset Category
Value
at 91.83 %
Net current assets
$ 7,431,090
$ 7,431,090
Land
632,000
580,383
Buildings and leasehold
improvements
1,857,293
1,705,552
Machinery and equipment
7,815,905
7,177,346
Leasehold Interest
1,082,738
994,278
Patents
16,000,000
14,693,000
Investment in
Subsidiaries
1,544,541
1,418,352
Total
$36,363,567
$34,000,001
Disston claimed amortization of the patents in question *35 based on a seven year useful life and the cost basis of $14,693,000 for both patents. The 1972 and 1973 returns were audited by the Internal Revenue Service and an Engineering and Valuation Report, dated August 7, 1975, was prepared by Valuation Engineer Christy J. Moratis. In this report which was incorporated into the Revenue Agent's Report the fair market value of the patents was determined to be $12,170,000 and goodwill to be $1,466,433 which represented the difference between the purchase price and the combined amount of the tangible assets and patents. The other assets, land, buildings, etc. were accepted at the appraised values used by Disston. Disston in its returns for taxable years ended December 31, 1974 and 1975 and February 6, 1976, which are the subject of the instant case, adopted the Revenue Agent's Report values in determining the depreciation, amortization and loss deductions with respect to the relevant assets, including the patents. In its 1975 return, Disston claimed a loss incurred with respect to the patents in the amount of $9,858,380, as a result of the patents' being declared invalid. In the notice of deficiency issued in this case, respondent determined *36 that section 351 [1] applied to the transfer of assets to Disston so that Disston had carryover bases for the assets acquired from Porter. Respondent determined that the carryover basis of the patents was zero and therefore, the amortization and loss deductions for 1974 and 1975 were disallowed.Respondent's answer alleged that petitioner had not shown that the fair market value of the patents exceeded amortization deductions taken prior to 1974. After the pleadings were closed, respondent stipulated that section 351 did not apply to the transfer, and that Disston's basis with respect to the assets which Porter transferred to Disston was the fair market value of the assets on the date of transfer, February 29, 1972. The parties have stipulated that the fair market values of the net current assets, land, buildings, and leasehold improvements, machinery, equipment and leasehold interest equal those values determined by the Patchin appraisal.The parties also stipulated that valuation of the assets which Porter transferred to Disston is at issue in this case only with respect to the patents, the stock in the Canadian subsidiaries and other intangible assets. *37 The cost of assets acquired by purchase of stock is equal to the fair market value of the stock. Pittsburgh Terminal Corp. v. Commissioner,60 T.C. 80, 87 (1973), affd. without published opinion 500 F.2d 1400 (3d Cir. 1974). The parties agree that in order to determine the cost basis of each asset, the fair market value of the stock is allocated among each asset in proportion to its relative fair market value. Fair market value has been defined as the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy nor sell and both being reasonably informed as to all relevant facts. United States v. Cartwright,411 U.S. 546, 551 (1973). To substantiate their respective claimed values, both parties presented expert witness testimony. Two of petitioners' experts, George Patchin, Jr. and Gerald G. Gray, Jr., in their respective capacities as President and Business Valuation Manager of Patchin prepared the three-volume appraisal completed on October 13, 1972. *38 A portion of the appraisal deals with the patents for grass shears. Patchin estimated the future beneficial income to be derived from the patents and then discounted it to present value as of February 29, 1972. Beneficial income was measured by estimating the expected royalties to be received from other manufacturers of the patented products as well as the amount for "royalty relief," i.e., the amount of savings incurred by Disston, as patentholder, of not having to pay the royalties to another manufacturer. In their opinion in light of the fact that the patents covered the same product, it was not possible to estimate the income for each separate patent and therefore they estimated the value of both patents together. They estimated that the economic life of the patents would be seven years, that is through 1978, although the legal lives were longer (17 years for one and 14 for the other). Technological advances and economic changes would cause the patents to become obsolete. Based on their discussions with the management of Disston and their study of the market, the appraisers estimated that the ultimate market for cordless grass shears was approximately 50 percent of the power *39 lawn mowers market, which was then approximately 38 million and expected to soon be in excess of 40 million. Therefore, the total market for the cordless grass shears was estimated to be 20 million. Patchin believed that Disston would maintain a 50 percent share of this market. In addition, in estimating the sales of replacement units, they estimated that the grass shears had a useful life of 5 years and therefore the attrition rate would be 20 percent each year. Based on these estimates, projections of sales of cordless grass shears products were made through 1978. To develop the anticipated excess earnings attributable to the patents, Patchin broke down these projections of total unit sales among four models based on the percentages of the projected sales in 1972 of each of the models. Patchin then multiplied the units sales by the 1972 distributor price (rather than retail price), for each of the models. The distributor prices which had already been lowered because of competition were assumed to remain constant. If no competition were present, a higher price could be demanded, but because of the uncertainty of the patent litigation, Patchin used the same distributor's price *40 for 1972 and each subsequent year until 1978. Patchin then computed gross income from the patented shears, took various charges against the gross income such as cost of sales and expenses to arrive at net income, and subtracted a working capital requirement based on 8 percent rate of return, and return on investment in assets employed of 10 percent to arrive at the amount of excess income attributable to the patents. Their study of various products and various royalties paid thereon showed royalty rates in the range of 1 to 15 percent. Because the patented grass shears market was large and because the invention was unique, they estimated that 10 percent of the distributor's price, which was roughly equivalent to 7 percent of the retail price was a reasonable rate for royalty relief. They believed this rate for royalty relief was reasonable because there was a sufficient amount of excess income to support it. Their estimate of excess income and royalty relief is as follows: Year
Royalty Relief
Excess Income
1972
$1,322,800 $1,365,000 1973
2,057,800
2,786,000
1974
2,645,900
4,061,000
1975
2,939,700
4,711,000
1976
3,233,700
5,466,000
1977
3,233,700
5,430,000
1978
3,233,700
5,472,000
*41 Also added into their appraisal was the amount of royalty relief to be received from replacement blades based on a useful life of three years. They then computed the amount of the royalty income which Disston could expect to receive from other manufacturers. Taking into account that other manufacturers are less willing to pay royalties, that Black and Decker offered a royalty rate of 5 percent, as well as the risk of the patent litigation, Patchin concluded that Disston could expect to receive royalty income at a rate of only 5 percent. Based on the estimate that Disston would maintain a 50 percent share of the market, Patchin then computed the amount of sales of competitors to arrive at the amount of royalty income. To test the reasonableness of this estimate, they compared it to the amount of excess income and found the royalty income to be about 31.5 percent of profit and believed that this was within the acceptable range. Adding up all these figures, the patent income benefits would amount to $29 million. However, because this was income to be received in the future, there was an element of time and risk involved. Patchin adopted the Inwood theory to select a discount *42 rate to arrive at the present worth of the income. Because they believed that the risk in this case would increase as the years went by and because of competition, they used an increasingly higher discount rate for the future years rather than a steady average rate. Applying the Inwood factor, they arrived at a total patent rights value of $16,043,100, rounded off to $16 million. Under both the residual method and the estimation of excess income method, no amount was found to be attributable to goodwill. Patchin and Gray also prepared a 1984 report in which they reviewed their original 1972 appraisal and concluded that it was fair and reasonable. Based on their discussions with the patent counsel and the Disston management, they concluded in 1972 that substantial royalty benefits would inure to Disston whether by Court order or settlement agreement. Patchin, however, realizing there was a risk involved, attempted to measure this risk in several ways. Some of these were: 1) the use of the distributor's price as forced lower by competition; 2) use of 5 percent as a royalty income rate rather than the 10 percent fair royalty rate; 3) application of the royalty rates to distributor's *43 price rather than the retail price; 4) the assumption that Disston would share with competitors as large a portion of the market as 50 percent; 5) the assumption throughout the 1972 valuation that after seven years, the patents would not generate significant income or would be obsolete; and 6) the use of the high and increasing variable discount rate under the Inwood theory. As part of its case, petitioner subpoenaed the IRS Valuation Engineer Christy Moratis and submitted into evidence his report dated August 7, 1975. Respondent objected to the inclusion of the testimony and the report which related to the prior audit on the grounds that petitioner may not attempt to go behind the notice of deficiency. Respondent argues that the agent erroneously assumed that the patents were valid and that an erroneous valuation based on a prior audit is not binding on respondent. As to the argument that petitioner is attempting to go behind the notice of deficiency, the notice itself refers to the agent's report, specifically when calculating the allowable remaining depreciation and amortization deductions for the years at issue. We agree with respondent, however, that the agent's report *44 is not binding on respondent nor this Court. Casey v. Commissioner,38 T.C. 357, 381 (1962). However, it may be considered and weighed with the other evidence.[2] Moratis agreed with Patchin that it was appropriate to value the patent rights of both the design and mechanical patent together. The engineer, however, disagreed with using a seven year economic life. Although the market demand might decline after seven years, it would not disappear completely. Based on the superiority of the Disston product, and the case of Hazeltine Corp. v. Commissioner,89 F.2d 513 (3d Cir. 1937), the engineer believed that the patents should be valued over the remaining legal life of the two patents. In the engineer's view, Patchin's data did not sustain the 10 percent royalty relief rate. The 10 percent rate would require a pay out of over 60 percent of the excess income computed by Patchin, therefore the engineer recommended using 5 percent for both the relief from royalty rate as well as the royalty income rate. Based on these two changes, the engineer computed a value of the patents of $12,170,000 for both patents as of February 29, 1972. Using the subtraction *45 method, the engineer computed the amount of $1,466,433 for goodwill. All other appraised values of Patchin were accepted. Ernest J. Lawinger, member of the American Society of Appraisers and Senior Vice President of Valuation Research Corporation also prepared a report in 1984 at the request of petitioner. Mr. Lawinger reviewed the prospectus and the grass shear patents, interviewed and obtained information from people previously associated with Disston and interviewed Mr. Patchin and reviewed the 1972 Patchin Appraisal. Based on his review, Mr. Lawinger concluded that the purchaser of the patents in 1972 would reasonably predict a successful outcome of the pending litigation. Mr. Lawinger estimated a 10-year life for the patented shears before they would become obsolete, made estimates of the market for patented shears, and Disston's share of the market, the pricing of the shears over their estimated product life and the value of and the required returns on the assets employed in the production of the patented shears. Mr. Lawinger *46 applied an income approach to value the patents, i.e., present value of the estimated future earnings attributable to the asset. Analyzing all available data, including the high profitability of the patents and the 8-10 year life of the patents, he selected a royalty rate of 5 percent for both royalty income and royalty relief. He used a formula which would compute present values of the benefits of the ownership of the grass shear patents on an after tax basis and account for the benefits of amortizing the patents of the remainder of their tax lives. He concluded that the fair market value on the relevant date was $11,900,000. Petitioner also presented the testimony and report of Stanley J. Price, Jr., Esquire, a patent attorney in Pittsburgh, Pennsylvania, concerning the validity of the Disston patents. Mr. Price reviewed the material available to Disston as of February 29, 1972. Based on his review of the prior art, he concluded that the difference between those patents and the Disston patents were substantial. In addition, based on the secondary considerations listed in the Supreme Court opinion of Graham v. John Deere Co.,383 U.S. 1, 17-18 (1966), as indicia *47 of nonobviousness, including commercial success, long-felt but unsolved needs, failures of others, etc., he believed that the Disston patents were valid. The shears had experienced unprecedented sales from 1969 through 1972. Such commercial success also indicated that a long felt need, that had been unsolved, was filled by the shears. Upon his examination of the shears, it appeared that Black and Decker and Sunbeam shears both copied the Disston shears. In conclusion, it would have been his opinion on February 29, 1972, that the mechanical and design patents of Disston were valid and that the Sunbeam and Black & Decker cordless grass shears infringed those patents. Respondent presented the testimony and report of L. Lawton Rogers, III, a patent attorney. Mr. Rogers' report is divided into two sections. The first section concerns the validity of the mechanical patent. Mr. Rogers performed no independent prior art investigation but relied upon the prior art cited by the U.S. Patent and Trademark Office and by Black and Decker and Sunbeam in the patent litigation. Mr. Rogers also did not examine the shears in question. After reviewing the claims of the mechanical patent and comparing *48 them to the prior art, Mr. Rogers concluded that the basis for the patentability of all the claims of the patent lay with the construction of the blades, i.e., a relatively fixed blade with relatively short teeth and a relatively thin moveable blade with relatively long teeth so that the teeth of the moveable blade are independently flexible to slide up and over a tough grass blade to avoid jamming. He then compared the blade configuration of the Disston patent to the General Electric model TA-80 and concluded that the only difference in blade construction would be found in the relative thickness language used in the Disston patent. Since that language was undefined, the claims were indefinite with respect to novelty. In his opinion, the likelihood of the patent being held valid was only 20 percent. It was also his opinion that in general only about 25 percent of patents litigated are found valid through an appeal. The second section of this report dealt with the valuation of the patent. Mr. Rogers holds no professional affiliations with any appraiser organizations. He used a formula which multiplied together the following factors: (1) estimated total market; (2) anticipated *49 market penetration; (3) unit cost; (4) a reasonable royalty rate which takes into consideration both validity and infringement; and (5) discount factor for the present value of money. For the total market, Mr. Rogers accepted the Patchin estimate of 20 million shears. He also accepted the life expectancy rate of the shears to be five years. However, in his opinion, he used an attrition rate of 10 percent as opposed to 20 percent used by Patchin and, therefore, the replacement market would equal 6 million units. In his opinion, of the 26 million unit total market of cordless grass shears, a certain percentage of this total market would be occupied by shears which did not infringe the patent. He arbitrarily assumed that the percentage of market penetration for grass shears which did not infringe on the patent would be 50 percent. For unit cost, he took the sales figures used in the Patchin appraisal and came up with a weighted average of $14.70. In his opinion, the 10 percent rate for relief from royalty was too high partly because all of the excess income would be attributable to the patent, leaving no profit for other intangibles. He started with the 5 percent royalty rate, discounted *50 it by a factor of 80 percent because of the validity issue, resulting in a 1 percent royalty rate. Mr. Rogers adopted the Inwood Factors in the Patchin Appraisal but calculated a weighted average of .548. With respect to the replacement blades, Mr. Rogers used an attrition rate of 1/6 instead of 1/3 for a three-year average life. He then calculated the total value of the patent to be approximately $1,100,000. Mr. Rogers also included three "common sense approximations:" one based on the Black & Decker offer of $500,000 to arrive at a value of $1,000,000, one based on the cost of litigation to arrive at a value of $500,000, and one based on the cost of redesigning which he estimated to be $150,000. Respondent's other expert, Boyd Goff, a financial analyst, made an estimate of excess earnings to determine the parameters of the value of the intangibles. He began by estimating the company's earnings capacity by doubling the shears sales and increasing other products by 5 percent; he then applied the same operating cash margin as in 1971 to arrive at operating cash flow of $5,760,000. He assumed it would grow at 5 percent per year. He then deducted from this amount, depreciation, *51 taxes and 10 percent rate of return on tangible assets (instead of using the appraised values he incorrectly used the lower apportioned values) to calculate excess earnings attributable to intangibles of $1,400,000. By use of a formula which inexplicably deducted the 5 percent growth rate from the 10 percent capitalization rate, he capitalized all excess earnings to the patents and arrived at a maximum value of $6,263,000. He also capitalized all excess earnings to goodwill and arrived at a value of $11,950,000. In his report he valued the two patents together at $723,000. Mr. Goff applied a 1 percent royalty rate based on his review of the prior art, and the competitive products already on the market. He opined that Disston would not receive royalty income from other manufacturers and, therefore, he calculated the income stream based only on royalty relief. In his written report, he adopted the Patchin revenue projections for 1972 through 1978 and multiplied by the 1 percent rate. He then applied an 18 percent discount factor which was three times as high as the rate for Treasury bonds because of the risk associated with an intangible asset. He then utilized a formula to *52 take into account the after tax income including the tax benefit attributable to the amortization of the patent. In his testimony, Mr. Goff used a different approach in that he applied his own sales projections of $16,400,000, twice the sales volume generated in 1971, assumed revenue capacity would grow at 5 percent, applied a 1 percent royalty rate, and a 10 percent discount rate. As a result, he obtained a value of $734,000. In his report he estimated the goodwill/going concern to be $13,970,000 or 40 percent of the value of the company based on the residual method. He admitted in his testimony that this percentage was unusually high. Respondent called as witnesses, Burton Franklin, Chief Engineer, then Director of Engineering of the Disston Division from 1960 to 1964, and Donald Harness, patent counsel for Black and Decker in the patent litigation. Mr. Franklin was not included on the list of witnesses in respondent's trial memorandum submitted to the Court and petitioner. (Petitioner apparently received a handwritten version which did include his name but he was not represented as an expert witness. The memorandum stated only the following: "Burt Franklin, engineering *53 consultant, will testify as to patent marketing.") Mr. Harness, although listed as a witness was not represented to be an expert witness. Respondent did not furnish the information called for in Rule 71(d)(1) of the Tax Court Rules of Practice and Procedure regarding names of expert witnesses and summary of opinion in response to petitioner's 1979 interrogatories or a supplemental response as required by Rule 102. Nor did respondent submit to petitioner an expert witness report by either Mr. Franklin or Mr. Harness in lieu of this information. This Court's Standing Pre-Trial Order which accompanied the Notice of Trial reiterated the requirement in Rule 71(d)(2) of the pre-trial exchange of any expert witness reports: Any EXPERT WITNESS REPORTS should be exchanged fifteen days prior to trial to permit full and careful study by the opposing party, and a copy should also be lodged with the Court at that time. See Rule 71(d)(2), Tax Court Rules of Practice and Procedure. At the trial, the expert's report will be marked as an exhibit, identified by the witness, and received in evidence as his testimony in chief. The qualification of the expert would be stipulated as set forth in *54 the expert's report unless there is proper ground for objection to such qualification. However, the party calling the expert may ask such supplemental questions as may be appropriate, after which such expert will then be made available for cross-examination. After petitioner has expended considerable time and expense to have prepared expert witness reports which were made available fifteen days prior to trial to respondent and his witnesses, it is unfair to allow respondent on the day of the trial to present expert witness testimony when petitioner has been given no notice of the substance of the testimony or the witness' credentials. Respondent represented to the Court that Mr. Harness and Mr. Franklin would testify only to factual matters within their personal knowledge and not as expert witnesses. However, respondent's questions to Mr. Franklin attempted to elicit expert opinion from him. In view of respondent's failure to notify petitioner of Mr. Franklin's testimony by means of the trial memorandum, answer to interrogatories or a report, this Court allowed Mr. Franklin to testify only as to factual matters within his personal knowledge. See Rule 104(c) of Tax Court Rules *55 of Practice and Procedure. Neither witness provided much relevant testimony. Mr. Harness testified to what he advised his client in the patent litigation -- not surprisingly he took a different view from Porter's counsel. Mr. Franklin's in depth knowledge of Disston Division matters, in particular its trademarks, extended only up to 1964, eight years prior to valuation date. Although he maintained consulting ties with Disston after that, it was not clear from his testimony what information he had or its source. The widest variance among the experts concerned the validity of the patent which in turn affected the royalty rate used. Petitioner objected to the inclusion into evidence of Mr. Roger's and Mr. Goff's testimony and reports on the grounds that they had relied on subsequent events, i.e., the District Court's opinion in the patent litigation, to reach their conclusions regarding the validity of the patents. Resort to hindsight is not permissible in making valuation determinations. Ithaca Trust Co. v. United States,279 U.S. 151 (1929). Subsequent events may *56 be considered for limited purposes. In Couzens v. Commissioner,11 B.T.A. 1040, 1165 (1928), we explained: Serious objection was urged by respondent to the admission in evidence of data as to events which occurred after March 1, 1913 [the valuation date]. It was urged that such facts were necessarily unknown on that date and hence could not be considered. It was apparent that there was a fear that the Board would in reaching its judgment be influenced toward a higher value if it were permitted to see the evidence of increasing value after the date in question. The evidence was nevertheless admitted. It is true that value on March 1, 1913, is not to be judged by subsequent events. There is, however, substantial importance in the reasonable expectations entertained on that date. Subsequent events may serve to establish both that the expectations were entertained and also that such expectations were reasonable and intelligent. Our consideration of them has been confined to this purpose. Such subsequent events as have no reasonable relation to the considerations of the date in question have been disregarded. We have not, by looking at the subsequent events *57 now known, found what the value would have been had they been definitely known on March 1, 1913. The only facts upon which our judgment of value has been predicated are those reasonably known on that date. These included not only those which had completely occurred, but also those which were in process and those which were reasonably in contemplation. Therefore, while the outcome of the patent litigation may be admissible into evidence (and indeed is the basis for petitioner's claim for the loss on the patent in 1975), it cannot be viewed as controlling in determining the value of the patent. See Estate of Jephson v. Commissioner,81 T.C. 999 (1983). If we did, we could simply ignore all expert testimony and conclude that the patent was invalid and, therefore, had no value. However, we must look at the facts as reasonably known on the valuation date of February 29, 1972. The purchasers of the Disston stock were aware of the patent litigation because of the disclosures in the prospectus. What no one could know with absolute certainty was the outcome of the patent litigation. We, therefore, have evaluated the evidence and testimony in light of what would have *58 been the reasonable expectations of a purchaser of the Disston patents as of February 29, 1972. Mr. Puth, President of Disston and a purchaser of Disston stock, testified that in his view the cordless grass shears represented a unique invention, were responsible for the increase in earnings of the company and made possible the public offering. While he acknowledged that the language of the prospectus was couched in guarded terms, the opinions of the patent counsel expressed to him were highly favorable. (This view was supported by George Patchin and Ernest Lawinger based on their discussions with Disston people and patent counsel.) He and the institutional buyers of the stock believed that the patents were of significant value. This view that the litigation would be successful is borne out by the fact that Porter instituted the suit, rejected the offer from Black and Decker and pursued the suit up through the appeal. We are not inclined to give much weight to Mr. Goff's opinion regarding the patent claims and prior art. He is not a patent attorney and portions of his report copied with minor variations the District Court opinion. The validity section of the report by Mr. Rogers, *59 who is a qualified patent attorney, is also somewhat troubling in that he did no independent investigation of prior art but relied on that cited by Black and Decker and Sunbeam in the litigation. The conclusions reached were those of an adversary whose position in the litigation was not even known to Porter's patent counsel on the valuation date. Mr. Rogers should have done his own investigation and reached his own independent conclusion as to validity. Mr. Harness, patent counsel for Black and Decker, testified that Mr. Olive, the attorney who filed the patent application for Porter, was aware of the G.E. shears and that this knowledge was the basis for Black and Decker's fraud claim against Porter. The district court found that no fraud had been perpetrated on the Patent Office but that Mr. Olive took a more narrow view of the prior art. The district court in its opinion regarding obviousness cited the Riley patent which was known and cited by the Patent Office in issuing Disston's patent. It should also be noted that an issued patent is presumed to be valid by statute, 35 U.S.C. P382 (1970). In this case, the opinion of Porter's patent counsel was that *60 the law suit would be highly successful. Petitioner's expert, Stanley Price, substantiated the reasonableness of this opinion based on the information available at the time. In addition, we have the contemporaneous appraisal of Patchin which took into account in several different ways as outlined in its 1984 update appraisal, the risk of the patent litigation. We also think it is noteworthy that the IRS engineering agent, while aware of the district court opinion (although not yet aware of the outcome of the appeal) still took the view that the patents were worth $12 million. [3]
The evidence and testimony presented convinces us that it would have been reasonable for a purchaser of the Disston patents as of February 29, 1972 to expect that the law suit would succeed and thereby to accord significant value to the patents. This view is corroborated by one subsequent event, the *61 dramatic decline of the Disston stock market price after the issuance of the district court opinion on June 28, 1974. Respondent on brief asks us to look at the data of the actual sales of the shears. First, although sales data is contained in the stipulation, petitioner has not stipulated that it is accurate and respondent did not submit any evidence at trial. Respondent's own experts did not utilize such data. They relied on Patchin's sales projections to some degree. Mr. Goff in his written report (although not in his testimony) based his value of the patents on the Patchin revenue projections. Mr. Rogers used the total market estimate of twenty million units as well as the cost per unit projections. (Mr. Rogers admittedly arbitrarily assumed a 50 percent market penetration figure which was not based on any hard information). Respondent failed to produce any testimony or reliable evidence which impugned the credibility of the Patchin appraisal in this regard. We have carefully reviewed and considered the reports and testimony of all the witnesses. We found George Patchin and Gerald Gray's reports and testimony particularly credible and impressive. The 1972 Appraisal Report *62 was comprehensive, coherent and provided substantiation wherever possible for the calculations. It also was prepared only a few months after the valuation date. We agree with Mr. Lawinger and Mr. Moratis that the royalty rate of 10 percent for royalty relief was too optimistic particularly in light of the percentage of excess earnings. We also agree that the value of the patents should be determined over their remaining legal lives. See Hazeltine v. Commissioner,supra at 521; Simmonds Precision Products, Inc. v. Commissioner,75 T.C. 103 (1980). We do not give much weight to Mr. Rogers' appraisal section of his report. He admitted that he does not value patents as part of his practice. Mr. Rogers' formula used much less precise data than Patchin, such as the weighted unit cost and the weighted Inwood factor. Mr. Rogers disagreed with Patchin's attrition rate of 20 percent but he did not explain why. Respondent attempts improperly on brief to do so. However, Mr. Gray clearly and convincingly explained the proper percentage attrition rate. Furthermore, Mr. Rogers' "common sense approximations" failed to use an income approach which *63 was acknowledged by the other appraisal experts to be the acceptable method of valuing a patent. [4]
Mr. Goff's report was difficult to follow and his testimony failed to clarify matters. He used one set of data and assumptions for valuing the patents in his written report and used another in his testimony without furnishing an explanation as to why. Petitioner's expert, Mr. Gray, effectively demonstrated how Mr. Goff incorrectly applied his own formula to compute the capitalization of excess earnings. (Respondent belatedly attempts to overcome this problem by including charts in his reply brief which are not included in the record of this case and therefore *64 will not be considered.) In conclusion, we find that the value of the two patents was $12,170,000 as of February 29, 1972. This Court determined in an Order and Memorandum Sur Order, dated October 19, 1984, that because respondent raised a new matter in the pleadings, i.e., the fair market value of the Disston assets, respondent had the burden of proving such values. With respect to the valuation of the patents, petitioner has persuaded us by a preponderance of the evidence that its claimed value for the patents is correct. Therefore, the issue as to what party has the burden of proof is immaterial. With respect to the value of Disston's investment in the Canadian subsidiaries, petitioner argues that this issue was not raised in the notice nor in respondent's answer, both of which concerned only depreciable or amortizable assets. However, the parties did stipulate that the valuation of Disston's investment in the Canadian subsidiaries is at issue. Patchin's appraisal stated the following: INVESTMENT IN SUBSIDIARIES
As with current assets and liabilities, we made no audit or inspection of the Canadian subsidiaries. We believe that the values shown on the books for *65 the investment in these subsidiaries is fair and reasonable as presented by the client. Investment in subsidiaries is summarized as follows: Investment In Subsidiaries
February 29, 1972
J.P. Ruel, Inc.
$168,062.00
Disston (Canada), Inc.
1,376,479.00
Total Investment in Subsidiaries
$1,544,541.00
Contrary to respondent's assertions, the financial statements which Patchin relied on had been audited, not by Patchin, but by Arthur Anderson Co. Respondent, while accepting the book value for J.P. Ruel, Inc., argues on brief that the fair market value of the shares of Disston (Canada) formerly Shurly-Dietrich Akins Co., Ltd. is not equal to book value. Respondent bases this argument on the fact that the shares were exchanged for 125,000 shares of Disston stock which was selling at $17.00 a share. Therefore, in respondent's view, the fair market value of the stock is $2,125,000. Respondent, who has the burden of proof, has not shown that the exchange of stock between Porter's wholly-owned domestic subsidiary (Disston) and its Canadian subsidiary (Disston Canada) was at arm's length. Nor has respondent presented any evidence regarding the method *66 for arriving at the amount of 125,000 shares. Book value has been accepted in the absence of better evidence of fair market value. Bos Lines v. Commissioner,354 F.2d 830, 839 (8th Cir. 1965), affg. a Memorandum Opinion of this Court; Edwards v. Commissioner,39 B.T.A. 735, 737-738 (1939). [5] We find it is appropriate to do so in this case. We believe that it is appropriate in this case to use the residual method to value goodwill. See Banc One Corp. v. Commissioner,84 T.C. 476 (1985). Although respondent discusses at great length the value of Disston's name, the trademarks, going concern value and goodwill, respondent advocates the use of this method as well. Subtracting the agreed values of the tangible assets and the determined values for the patents and investment in Canadian subsidiaries, we find the value *67 for goodwill is $1,466,433.[6]
To reflect the foregoing and the concessions in this case, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. See Gilmartin v. Commissioner,T.C. Memo. 1973-247↩, T.C.M. 1156, 1163, 42 P-H T.C. Memo. par. 73,247 at 73-1117.
3. Moratis testified that if he had known that the taxpayer had exhausted all appeals, he would have found a lower value of approximately four million. This testimony clearly demonstrates the problem with using hindsight to make valuation determinations and, therefore, we do not accord it any weight.↩
4. Respondent relies on the case of Smith v. Cmmissioner,T.C. Memo. 1981-219↩, where this Court accepted the values of patents as propounded by Mr. Rogers. That opinion states that Mr. Rogers paralleled the approach and utilized the data of petitioner's appraiser. He, however, also considered patent validity and technological feasibility in his approach, matters clearly within his expertise. Here, Mr. Rogers did not parallel the approach taken by Patchin but to some extent used his own value judgments.
5. See Fedders Corp. v. Commissioner,T.C. Memo. 1979-350, affd. without published opinion 659 F.2d 1066 (3d Cir. 1981), cert. denied 454 U.S. 862 (1981) revd. on another issue sub nom. Borg-Warner Corp. v. Commissioner,660 F.2d 324↩ (7th Cir. 1981).
6. After the submission of the post trial briefs, respondent filed a motion for leave to file amendment to answer in order to assert the applicability of section 6621(d) as it relates to the valuation of the patents. That section imposes an increased interest rate with respect to substantial underpayments attributable to tax motivated transactions. Because we have found that there is no substantial underpayment, the motion is deemed moot.↩